[Crim. No. 7963. In Bank. Nov. 25, 1964.]

THE PEOPLE, Plaintiff and Respondent, v. MONROE
SMITH HALL, Defendant and Appellant.

Don Edgar Burris and E. V. Cavanagh, under appointment by the Supreme Court, for Defendant and Appellant.

Stanley Mosk and Thomas C. Lynch, Attorneys General, William E. James, Assistant Attorney General, and Gordon Ringer, Deputy Attorney General, for Plaintiff and Respondent.

TRAYNOR, C. J.—Defendant was charged by information with murder.[1] (Pen. Code, § 187.) He waived a jury trial, and the court found him guilty of murder in the second degree. (Pen. Code, § 189.) He appeals from the judgment[2] on the ground that the evidence is insufficient to support it.

Just before noon on Saturday, May 19, 1962, a resident of a one-story hotel in Los Angeles noticed blood at various points along the hallway. He pushed open the door of the kitchen used by all the residents of the hotel and, without entering, saw Ethel Mae Johnson lying in blood on the floor. He went to the porch and asked a passing female neighbor to call the police. When officers from the Los Angeles County Sheriff's Office arrived, they found the decedent nude with a curtain rod and cloth loosely wrapped around her neck and a bloody rag across her midsection. She had been stabbed 49 times.

There was a considerable amount of blood in the kitchen, two spots in an adjacent room that the decedent shared with her lover, a trail of blood leading diagonally across the hall, and blood smears elsewhere on the floor and walls of the hallway. The investigating officers noticed two soleprints and two heelprints made by a man's shoes in the blood near the body. They also found the kitchen window broken through, the window screen pushed out, some broken glass, and a bloody handprint on the wall just outside the window. A blood-stained man's glove lay on the kitchen floor. Its mate was found across the hall in a room that the decedent sometimes occupied.

Two residents of the hotel told the officers that while in bed earlier that morning they heard the decedent's voice and the sounds of a "commotion." Her words suggested to them that she was in imminent danger of being "cut" by a person she seemed to be addressing as "Monroe." Interviews with others closely associated with the decedent tended to indicate that defendant, Monroe Hall, was the only Monroe that the decedent knew. He had lived at the hotel and was an old friend of the man with whom she lived. Defendant had a criminal record that included a conviction for assault with a deadly weapon. (Pen. Code, § 245.) █ Although no one had seen him near the premises for at least two weeks, includ-

---

[1] The information also charged him with three prior felony convictions. He admitted them at trial.

[2] Defendant's appeal from the order denying a new trial is dismissed. (Pen. Code, § 1237, subd. 2.)

ing the day of the killing, the investigating officers teletyped their information to the Los Angeles Police Department and asked for his arrest.[3]

At 9:30 that evening, officers of the Los Angeles Police Department, without a warrant (Pen. Code, § 836), accosted defendant on the street. He cooperated fully. The arresting officers handcuffed him and took him to the 77th Street Police Station for booking. Defendant's testimony that after the booking he requested and was denied permission to call a lawyer was uncontradicted.[4] The police then transferred him to the Firestone Sheriff's Station where Sergeants Collins and Thornton, who had investigated the crime, took charge.

The sergeants noticed a brown splotch on the bottom of the defendant's right shoe. Both shoes were removed and given to chemical experts who performed benzidine tests for the presence of blood. Parts of three spots removed from the area where the instep meets the heel reacted positively to the benzidine. Only one spot was identifiable as human blood, but there was not enough of it to permit the blood type to be ascertained. Although one chemist testified that the spots appeared to be fresh, no test was made to determine their age. Detailed visual examinations and further benzidine tests made directly on the bottoms of the shoes failed to disclose any other traces of blood.

Sergeant Collins also noted that the instep areas of the soles of both shoes looked unusually scrubbed and whitened. (At the trial, the judge examined the shoes closely and noticed, in addition to their scrubbed appearance, a blackening on the whitened areas.) Although Sergeant Collins mentioned his observations to the chemists, they made no tests to determine what caused the discoloration. The chemists observed glass fragments in the soles of the shoes, but specific

---

[3]Defendant contends that his arrest without a warrant was illegal on the ground that it was made without reasonable cause (Pen. Code, § 836) and that evidence obtained from him after his arrest was therefore inadmissible. It is true that the officers learned that the decedent may have been a prostitute who might have known another Monroe. An officer has reasonable cause for an arrest, however, if he is aware of facts that would lead a man of ordinary care and prudence conscientiously to have a strong suspicion that the accused is guilty of a felony. (*People* v. *Fischer*, 49 Cal.2d 442, 446 [317 P.2d 967].) The facts must incline the mind to believe, but they may leave some room for doubt. (*People* v. *Ingle*, 53 Cal.2d 407, 413 [2 Cal.Rptr. 14, 348 P.2d 577].) These standards were met in this case.

[4]A violation of a defendant's statutory right to call a lawyer subjects the officer responsible to a misdemeanor charge. (Pen. Code, § 851.5, subd. (b).)

gravity tests showed no similarity between these fragments and glass found at the scene of the crime. In addition to these tests, the police took photographs of two scratches on defendant's face.

At 2:30 a.m., without telling defendant that he had a right to remain silent, Sergeants Collins and Thornton began to question him. At some point during the interrogation defendant was informed, apparently for the first time,[5] that he was being charged with the murder. He related in some detail his activities on the Saturday of the killing. Asked about the condition of his shoes, he explained their clean appearance by referring to a walk on damp grass, and a shine and cleaning earlier that evening. He could only speculate that shaving cuts might have caused the spots of blood. At the trial Sergeant Collins testified that defendant also said that he had washed his shoes with Clorox. At 3:07 a.m., when questioning continued in the presence of a reporter, however, defendant denied having scrubbed his shoes. In his transcribed statement he admitted knowing the decedent but denied stabbing her. After the interrogation the police kept defendant in custody and did not take him before a magistrate until the following Wednesday.[6]

At the trial, the two men who overheard the sounds of the crime said that they had gone to bed only a few hours earlier that morning after a long night of gambling and drinking. They made no effort to investigate any of these sounds when they heard them. Shortly thereafter, on leaving the hotel, they noticed bloodstains in the hallway and heard noises in the bathroom, but again made no effort to see what might have happened. Instead, they went out for more liquor. Only when they heard sirens did they return to the premises to speak with the police.

One of these witnesses testified to hearing the decedent

---

[5] The arresting officers violated section 841 of the Penal Code if they failed to inform defendant of the reason for his arrest. (Cf. *Willson* v. *Superior Court*, 46 Cal.2d 291, 294 [294 P.2d 36], where the arrest took place during the criminal act.) Such a violation, however, is not a ground for excluding evidence obtained after an otherwise lawful arrest. (See *People* v. *Maddox*, 46 Cal.2d 301, 305 [294 P.2d 6].)

[6] By failing to take defendant before a magistrate ''within two days after his arrest, excluding Sundays and holidays'' (Pen. Code, § 825), the officers exceeded the maximum period during which a defendant may be lawfully detained. California law, however, does not require the exclusion of evidence as a consequence of such a violation. (*Rogers* v. *Superior Court*, 46 Cal.2d 3, 10 [291 P.2d 929]; cf. *McNabb* v. *United States*, 318 U.S. 332 [63 S.Ct. 608, 87 L.Ed. 819]; *Mallory* v. *United States*, 354 U.S. 449 [77 S.Ct. 1356, 1 L.Ed.2d 1479].)

utter six statements over a period of about 15 minutes. The first four seemed to come from near the front door. "Wait a minute. I am going with you." "I am not going to tell the police anything about you." "Did he send you down here to do this to me?" "Here he come now for real." The other two seemed to come from the kitchen. "Monroe, don't kill me." "Don't cut my baby." This witness admitted that he could not be sure of the order in which the statements were made.

The other witness, awakened by the former, heard fewer statements. His testimony suggests that he heard the last two utterances. His report, however, differs both as to their probable locale and their content. According to this witness, the decedent was in the hallway and said: "Monroe, don't cut me. I will tell him I fell out of the bed." "Monroe, don't kill my baby."

Both witnesses were certain that the decedent said "my baby" and not "me, baby," although there is no evidence that the decedent had a baby and there is evidence that she was not pregnant. They also agree that they heard only the decedent's voice, that she spoke in a conversational tone, and that the sounds of a struggle were audible. Neither witness was sure whether the decedent uttered "Monroe" at the beginning or at the end of the statements in which she used the name. The testimony of each was inconsistent in particulars with statements each had made to the police on the day of the killing.

Other witnesses testified that, although the decedent had expressed some disapproval of defendant on one or two occasions, she was not afraid of him, and that he had not threatened her. No one knew if defendant had any romantic interest in her.

Defendant took the stand and told substantially the same story of his activities on the Saturday in question that he had given to the interrogating officers. Other witnesses corroborated defendant's testimony in many details.

At the close of the trial the prosecution revealed that a police search of defendant's apartment turned up no damaging evidence.

We agree with defendant's contention that the evidence is insufficient to support the judgment. In reviewing the sufficiency of the evidence an appellate court "must assume in favor of the verdict the existence of every fact that the [trier of fact] could reasonably deduce from

the evidence and then determine whether or not a reasonable [trier of fact] could find the defendant guilty beyond a reasonable doubt.'' (*People* v. *Huizenga,* 34 Cal.2d 669, 676 [213 P.2d 710] ; accord *People* v. *Robillard,* 55 Cal.2d 88, 93 [10 Cal.Rptr. 167, 358 P.2d 295, 83 A.L.R.2d 1086].)

■ ''Implicit in our duty to determine the legal sufficiency of evidence to sustain a verdict is our obligation, in a proper case, to appraise the sufficiency and effect of admitted or otherwise indubitably established facts as precluding or overcoming, as a matter of law, inconsistent inferences sought to be derived from weak and inconclusive sources.'' (*People* v. *Holt,* 25 Cal.2d 59, 70 [153 P.2d 21] ; see Jaffe, *Judicial Review: Question of Fact,* 69 Harv.L.Rev. 1020, 1026-1031.)

■ The evidence against defendant, standing alone, lacks substantial probative value. The decedent's use of the name ''Monroe'' is inconclusive. Although witnesses testified that defendant was the only Monroe that the decedent knew, she had been convicted of narcotics addiction, prostitution, and soliciting, and it was therefore likely that she had a wide and private circle of acquaintances. Moreover, as noted above, neither witness was certain whether she used the name at the beginning or the end of the statements in question. Thus, even if she knew no other Monroe, the testimony concerning her utterances leaves open the substantial possibility that she was naming him in answer to inquiries or accusations by her assailant rather than as her assailant.

The blood on defendant's shoes is likewise unconvincing. One of the chemical experts conceded that the spots could have been ''more than a week old, or less than a week old.'' One spot was identifiable as human blood, but since the chemists could not ascertain the blood type, there is no evidence connecting the spot with the decedent.

The fact that defendant may have said that he washed his shoes is equivocal at best.[7] There are many reasons for cleaning shoes, even with a bleaching agent.

The so-called scrubbed appearance of the whitened instep areas of the soles adds little more. Since the whiteness was

---

[7]Since no one informed him of his right to remain silent and he was denied counsel during interrogation, evidence of the alleged statement may have been inadmissible at the trial. (*Escobedo* v. *Illinois,* 378 U.S. 478 [84 S.Ct. 1758, 12 L.Ed.2d 977].) In the course of denying a motion for a new trial, however, the trial judge said: ''There was no testimony by any person that they had, in fact, been scrubbed. The impact was solely that I looked at them. . . . The shoes had this very scrubbed appearance, and that is what—not any person's testimony about it, but the fact that they were so scrubbed with their appearance at the time that he was taken, and the fact—well, really the fact that they were

confined to the instep, it would seem that no attempt was made to clean other parts of the shoes. Yet a man's footprints were found in the blood on the kitchen floor, and there is evidence that no one entered the kitchen between the time of the killing and the arrival of the police. One would therefore expect to find traces of blood in the threads and crevices of the soles of defendant's shoes. That expectation would be enhanced had the shoes been scrubbed, because scrubbing would tend to spread rather than localize the blood. Although the chemists made detailed examinations, they found no such traces. Moreover, even when thorough cleaning attempts are made, the sensitive benzidine test is capable of detecting minute quantities of remaining blood. (*People* v. *Modesto*, 59 Cal.2d 722, 726 [31 Cal.Rptr. 225, 382 P.2d 33]; *People* v. *Schiers*, 160 Cal.App.2d 364, 368 [324 P.2d 981, 329 P.2d 1].) The appearance of the whitened areas of defendant's shoes suggests that if he tried to clean them, he was certainly less than thorough. Yet when the chemists performed benzidine tests directly on these areas, they obtained negative results.

It is possible to speculate that the blackening on the whitened surfaces resulted from defendant's attempt to obscure the effects of the cleaning process. The original areas covered by the whiteness are still easily identifiable, however, and most of the blackening is present on the instep that was noticeably less affected by the original discoloration.

The scratches on defendant's face add nothing. No skin was found under the decedent's fingernails and there is no other evidence that she scratched her assailant.

Even if the foregoing evidence, standing alone, could support a finding of guilt beyond a reasonable doubt, such a finding is undermined by other undisputed evidence and by the absence of evidence that would normally be forthcoming.

The police found a man's shoeprints, including two heelprints, in the blood near the body. Although one of defendant's heels bears an unusual gash that might be expected to show up in a print, there is no evidence of such a gash in the heelprint. Further, chemical experts testified that the

scrubbed, not the fact that anyone said anything about them. The question of whether it was said, that simply tends to tie it to the fact that they were, in fact, scrubbed when they were taken off his feet. But, it is the scrubbing itself, rather than what was said about it.'' Hence the admission of testimony concerning the alleged statement was harmless. (Cf. *People* v. *Parham*, 60 Cal.2d 378, 386 [33 Cal.Rptr. 497, 384 P.2d 1001].)

glass lodged in the soles of defendant's shoes was not similar to any glass found near the broken window. The bloody handprint on the wall outside the window suggests that decedent or her assailant should have cuts on the hands or arms. Neither the decedent nor defendant had such cuts. Moreover, there is no evidence linking the print itself to either person. Apparently no fingerprints were discovered, and there is no evidence connecting defendant with the bloody glove on the kitchen floor or the curtain rod wrapped around the decedent's neck.

A police search of defendant's apartment disclosed nothing that would connect him with the bloody stabbing. There was no testimony that defendant and deceased were emotionally involved in any way, and no other motive has been suggested for the crime.

 Every attempt to connect defendant with the details of the killing failed. To justify a criminal conviction, the trier of fact must be reasonably persuaded to a near certainty. The trier must therefore have reasonably rejected all that undermines confidence. This case presents a mass of undisputed evidence and unexplained facts that destroys confidence in any inference pointing to guilt. Each item of evidence against defendant is so weak and inconclusive that together they are insufficient to constitute proof beyond a reasonable doubt.[8]

The judgment is reversed.

Peters, J., Tobriner, J., Peek, J., and Dooling, J.,* concurred.

McCOMB, J.—I dissent. I do not believe that the following statement in the majority opinion is an accurate statement of the law: "To justify a criminal conviction, the trier of

---

[8]Even if we could conclude that the meager evidence presented was sufficient, we might be compelled to reverse the judgment on the ground that the police disabled the prosecution from affording defendant a fair trial. The police kept him in custody for four days, denied his request for counsel, and failed to make tests that might have been probative of innocence or guilt. Whether or not due process requires a reasonably complete investigation of a crime, it is doubtful that a conviction can be upheld when an inadequate investigation has produced limited evidence and the police have rendered the defendant powerless to provide exculpatory evidence himself. (See *In re Imbler*, 60 Cal.2d 554, 567 [35 Cal.Rptr. 293, 387 P.2d 6]; *People* v. *Kiihoa*, 53 Cal.2d 748, 752-754 [3 Cal.Rptr. 1, 349 P.2d 673].)

*Retired Associate Justice of the Supreme Court sitting under assignment by the Chairman of the Judicial Council.

fact must be *reasonably persuaded to a near certainty*. The trier must therefore have reasonably rejected all that undermines confidence.'' (Italics added.)

It is my understanding that in a criminal case all that is necessary for a conviction is evidence that convinces the minds of those charged with passing upon the facts, and satisfies their consciences, that the defendant is guilty.

Proof beyond a reasonable doubt does not require proof to a mathematical certainty or proof which excludes a possible doubt. (Code Civ. Proc., § 1826.)

Section 1826 of the Code of Civil Procedure reads: ''The law does not require demonstration; that is, such a degree of proof as, excluding possibility of error, produces absolute certainty; because such proof is rarely possible. Moral certainty only is required, or that degree of proof which produces conviction in an unprejudiced mind.'' (See *People* v. *Ah Sun,* 160 Cal. 788, 791 [118 P. 240]; *People* v. *Brotherton,* 47 Cal. 388, 406.)

I would affirm the judgment for the reasons expressed by Mr. Justice Files in the opinion prepared by him for the District Court of Appeal in *People* v. *Hall* (Cal.App.) 37 Cal.Rptr. 686. (See also Witkin, Cal. Evidence (1958) § 123, p. 148.)

Schauer, J.,* concurred.

Respondent's petition for a rehearing was denied December 23, 1964. Mosk, J., did not participate therein. McComb, J., was of the opinion that the petition should be granted.

---

*Retired Associate Justice of the Supreme Court sitting under assignment by the Chairman of the Judicial Council.