[Crim. No. 13355.   Second Dist., Div. One.   Dec. 5, 1967.]

THE PEOPLE, Plaintiff and Respondent, v. ALBERT HAROLD GRIFFEN, Defendant and Appellant.

John Cramer, under appointment by the Court of Appeal, for Defendant and Appellant.

Thomas C. Lynch, Attorney General, Doris H. Maier, Assistant Attorney General, and Charles P. Just, Deputy Attorney General, for Plaintiff and Respondent.

FOURT, J.—This is an appeal from a judgment of conviction of possessing marijuana, and an attempted appeal from an order denying a motion for a new trial.

In an information filed in Los Angeles on July 20, 1966, defendant Griffen was charged with codefendants Sammie Mosley, Jr., Henry Turner, Jr., and Clifton Perkins with involvement in marijuana transactions. Count I involved Mosley in a transaction which occurred on June 14, 1966, count II had to do with Mosley in a transaction which occurred on June 15, 1966, count III had to do with Mosley, Turner and Perkins in a transaction which occurred on June 20, 1966, and count IV charged that on June 24, 1966, Mosley, Turner and Griffen offered to furnish marijuana in violation of section 11531, Health and Safety Code. Mosley was charged with a prior felony conviction and Griffen was charged with having been convicted of a violation of section 11530, Health and Safety Code, on about August 12, 1959. Griffen pleaded not guilty and denied the charged prior conviction. It was stipulated that the case in chief be submitted on the reporter's transcript of the preliminary examination with both sides reserving the right to offer additional evidence. Griffen was found guilty of a violation of the provisions of section 11530 of the Health and Safety Code (possession of marijuana), a lesser necessarily included offense to the charge contained in the information. The charged prior conviction was found to be

not true. Griffen was sentenced to the state prison. A timely notice of appeal was filed.

A résumé of some of the facts is as follows: At about 5:10 p.m. on June 24, 1966, Gordon White, an investigator with the United States Food and Drug Administration, entered the premises at 1956½ 103d Street, Los Angeles, for the purpose of purchasing marijuana. White on earlier occasions had made purchases of considerable quantities of marijuana at the above described premises from Griffen's codefendants.

White, upon entering the premises, spoke to Mosley about buying a large amount of marijuana, "possibly 10 kilos." Mosley suggested to White that he see Turner who was in the bedroom of the premises. Mosley went into the bedroom and then called White into the bedroom. White entered the bedroom and Mosley absented himself. White talked with Turner and told him that he, White, wanted to purchase "10 kilos or a little bit more if he could get it." Turner indicated that he had some friends coming back from Mexico, "and as soon as they arrived, he would be able to obtain" the marijuana for White. Turner inquired of White as to whether he, White, had the money for such a purchase and White replied that he had the money. Turner said that he had "four kilos" on hand and would have to obtain an additional six kilos "to make up the order of 10." Turner made a telephone call and then told White that he could not say how long it would take to obtain the additional marijuana. White left the location and reported what had occurred to the surveillant officers. White was gone from the house for about 15 minutes and then returned and entered the living room of the home whereupon Turner with others present told White "that he had something good working" for White. White inquired what it was and Turner said he had located someone with the marijuana and "he would be able to get it for me within an hour or so." Turner further related that "the people with the marijuana wanted at least $115 per kilo." White agreed to pay the price if he could "obtain the marijuana immediately." Thereupon Turner went outside the house and went to a green Plymouth 1954 or 1955 sedan automobile and appeared to talk with a person in the car. One of the persons in the car had "the same general appearance as . . . Griffen." Turner returned to the house and told White that "the people could obtain the marijuana, but they wanted the money in advance."

White told Turner that he was not willing to pay the money in advance and indicated that if that was the "way the

deal was going to go,'' it could not be completed and ''to forget it.'' Turner stated that he would give the person $600 of his own money to complete the deal and then went back to the Plymouth car outside and apparently again spoke to a person in the car. In about three or four minutes, Turner came back into the house and stated ''the delivery will be made in approximately 40 minutes.''

In about one-half hour the Plymouth car returned to the location. Turner left the house and went outside to the car and talked with the people in the car. One of the persons to whom Turner talked at the car had ''the same general appearance'' of Griffen. White sat down for about five minutes and Turner came back into the house carrying a cardboard carton. Turner motioned to White to join him in the kitchen where Turner placed the carton on the drainboard of the sink. Turner stated that there were eight kilos in the carton and that he would get the other four which would make a total of twelve kilos. Mosley and Perkins were in the living room when White went into the kitchen with Turner. White looked at the eight kilos of marijuana and stated that ''it looked like good stuff'' and indicated that he was satisfied, whereupon Turner stated, ''We might as well get rid of this other fellow'' and asked White for the money for the purchase.

At that point White started to remove his wallet and proceeded to count out the money. In accordance with a prearranged signal, Deputy Scriven entered and placed Turner under arrest. Griffen apparently had preceded Deputy Scriven into the house and was in the kitchen at the time of the arrest of Turner. The carton contained 6,717 grams (or about 14¾ pounds) of marijuana in compressed brick form.

During the time White was in the house the premises were under surveillance by a deputy sheriff. The deputy saw Griffen drive up to the Plymouth car, stop and get out, walk up to the house and return to the car with Turner, and then saw Griffen open the trunk of the car apparently with a key. Turner removed the cardboard carton and Turner and Griffen walked to the front of the house with Turner carrying the carton. After Turner and Griffen entered the house the deputy sheriff heard on the intelligence transmitter receiver from White, ''That is it. It looks good.'' The deputy sheriff with Sergeant Patrick and Agent Barron of the Food and Drug Administration, armed with a search warrant entered the residence and made the arrests.

Griffen testified and admitted that he previously had been

convicted of a felony, namely, of possessing marijuana on August 12, 1959. He testified on direct examination that he was the driver of the 1954 Plymouth car, that he drove to the house where Turner was and Turner asked him if he, Griffen, would "make a run for him," that Turner asked him "to go and pick up a box for him" at "his sister's house, or somewhere like that, used to have a girl friend, Miss Hill, used to stay next door to him. I knew where he was talking about." Further that Turner "told me that he wanted to make up his book, you know." that "[h]e asked me to go over there and pick up the box for him, you know." Griffen further testified that he had found the box in the back seat of an old car and that he had put the carton in the trunk compartment of his car.

On cross-examination Griffen admitted that he had seen marijuana before, that he looked into the top of the carton and—"saw what it was." The people in the house were not strangers to Griffen. The court noted that the marijuana was packaged and wrapped "the way kilos are generally wrapped." The judge also noted that Griffen had stated "that he quit fooling around,—back in 1959 or '61" and that he was fearful of the new laws with reference to narcotics.

No evidence was offered by the prosecution of the prior charged felony although it is clear that appellant had been so convicted and under the circumstances the court was compelled to find the charge untrue.

Appellant now asserts that there is no evidence to the effect that he had any knowledge of the narcotic character of the contents of the carton.

It is appropriately stated in *People* v. *Redrick*, 55 Cal.2d 282, 287 [10 Cal.Rptr. 823, 359 P.2d 255], that "[a]s might be expected, no sharp line can be drawn to distinguish the congeries of facts which will and that which will not constitute sufficient evidence of a defendant's knowledge of the presence of a narcotic in a place to which he had access, but not exclusive access, and over which he had some control, but not exclusive control." And, further, at pages 289-290: "The credence and ultimate weight to be given the evidence of the various particular circumstances are of course for the trier of fact, and 'It is the trier of fact, not the appellate court, that must be convinced of a defendant's guilt beyond a reasonable doubt. If the circumstances reasonably justify the trier of fact's findings, the opinion of the reviewing court that the

circumstances might also be reasonably reconciled with a contrary finding does not warrant a reversal of the judgment.' [Citation.]

''The rule that 'to justify a conviction on circumstantial evidence the facts and circumstances must not only be entirely consistent with the theory of guilt but must be inconsistent with any other rational conclusion' [citations] is primarily for the guidance of the trier of fact. Such rule would be applicable to appellate review of a conviction only where, giving to each circumstance in evidence all the legal effect toward guilt which it could support, it would still appear that a rational conclusion of innocence was not excluded.''

It is admitted practically that appellant exercised dominion and control over the carton and its contents (the 14 pounds, plus, of marijuana) and that he looked into the box or carton and saw what was in it. True it is that he testified that it looked like paper to him, but under the circumstances the court did not believe him.

■ The attempt by Turner to locate a person who could furnish the marijuana to meet White's request, the timely arrival of appellant, his desire to ''make the run,'' the demand for payment in advance, appellant's ready knowledge of where to go to pick up the carton, the packaging of the marijuana in an unsealed container or carton, appellant's inspection of what was in the carton, his concealment of the carton in the trunk compartment of the car, his previous familiarity with marijuana, his acquaintanceship with the codefendants in the house all lead compellingly to the inference that appellant knew that the carton contained marijuana. The weight to be given the evidence is with the trial court and he was convinced beyond any reasonable doubt of the guilt of appellant. We see no reason why the trial judge could not ''be reasonably persuaded to a near certainty'' that appellant was guilty of possessing marijuana and we do not believe that he, the trial judge, unreasonably ''rejected all that undermines confidence'' in his guilt. (See *People* v. *Hall*, 62 Cal.2d 104, 112 [41 Cal.Rptr. 284, 396 P.2d 700].)

■ ''The existence of possible exculpatory explanations, whether they are simply suggestions not excluded by the evidence or even where they could be reasonably deduced from the evidence, could not justify this court's rejecting the determination of the trier of fact that defendant is guilty unless on appeal it 'be made clearly to appear that upon no hypothesis whatever is there sufficient substantial evidence to

support the conclusion reached in the court below.' . . .''
(*People* v. *Redrick, supra,* p. 290.)

We think the judgment in this case was proper and free of error.

The judgment is affirmed. The attempted appeal from the order denying a motion for a new trial is dismissed.

Wood, P. J., and Lillie, J., concurred.