[Crim. No. 14616. Second Dist., Div. Three. July 28, 1969.]

THE PEOPLE, Plaintiff and Respondent, v. BRYAN E. GIBSON, Defendant and Appellant.

Grant B. Cooper, Roy A. Gustafson, Cohen, Whitfield & Osborne and Theodore J. England for Defendant and Appellant.

Thomas C. Lynch, Attorney General, William E. James, Assistant Attorney General, and Jack E. Goertzen, Deputy Attorney General, for Plaintiff and Respondent.

THE COURT.—In each of the first and third counts the defendant Gibson was accused of conspiring with Paul E. Griffin, Sr., and Paul E. Griffin, Jr., to commit the crime of bribery in violation of sections 165 and 67½ of the Penal Code.[1] In a nonjury trial he was found not guilty of those

[1]Section 165 is as follows: "Every person who gives or offers a bribe to any member of any common council, board of supervisors, or board of trustees of any county, city and county, city, or public corporation, with intent to corruptly influence such member in his action on any matter or subject pending before, or which is afterward to be considered by, the body of which he is a member, and every member of any of the bodies

charges. The defendant Gibson, however, was found guilty of the offenses of grand theft from Paul E. Griffin, Sr., and Paul E. Griffin Jr., as charged in the second and fourth counts. His motion for a new trial was denied. The proceedings were suspended without imposition of sentence and he was placed on probation for a period of three years on certain terms and conditions, one thereof being that he pay a fine of $5,000, together with a penalty assessment of $500. The appeal is from the judgment (order granting probation).

Included in the statutory crime of grand theft is the offense of obtaining property by false pretenses. (*Perry* v. *Superior Court,* 57 Cal.2d 276, 282-283 [19 Cal.Rptr. 1, 368 P.2d 529].) As stated in *Perry* (pages 282-283) : ''It is provided in Penal Code, section 484, that: 'Every person who shall . . . knowingly and designedly, by any false or fraudulent representation or pretense, defraud any other person of money . . . is guilty of theft.' Subdivision 1 of section 487 of the Penal Code provides, for instant purposes, that grand theft is committed when the personal property taken exceeds $200 in value. ■ To support a conviction of theft for obtaining property by false pretenses, it must be shown: (1) that the defendant made a false pretense or representation, (2) that the representation was made with intent to defraud the owner of his property, and (3) that the owner was in fact defrauded in that he parted with his property in reliance upon the representation. (*People* v. *Ashley,* 42 Cal.2d 246, 259 [267 P.2d 271] ; *People* v. *Jones,* 36 Cal.2d 373, 377 [224 P.2d 353] ; see Perkins, Criminal Law, ch. 4, § 4, pp. 267-268.)''

The sole contention made by the defendant Gibson is that the evidence was insufficient to sustain the first element of that offense, namely, the making of a false pretense or representation to the Griffins on either of the occasions alleged (on

mentioned in this section who receives, or offers or agrees to receive any bribe upon any understanding that his official vote, opinion, judgment, or action shall be influenced thereby, or shall be given in any particular manner or upon any particular side of any question or matter, upon which he may be required to act in his official capacity, is punishable by imprisonment in the state prison not less than one nor more than fourteen years, and upon conviction thereof shall, in addition to said punishment, forfeit his office, and forever be disenfranchised and disqualified from holding any public office or trust.''

Section 67½ is as follows: ''Every person who gives or offers as a bribe to any ministerial officer, employee, or appointee of the State of California, county or city therein or political subdivision thereof, any thing the theft of which would be petty theft is guilty of a misdemeanor; if the theft of the thing so given or offered would be grand theft the offense is a felony.''

or about September 20, 1964, and on or about October 15, 1965.)[2]

The evidence showed that the defendant Gibson, Mr. Griffin, Sr., and Mr. Griffin, Jr., joined together in a project for the development of approximately 92 acres of land in Chatsworth. The function assigned to the defendant Gibson related to the matters of zoning and land engineering. The land was purchased for $1,300,000. The escrow closed on April 4, 1964. The applicable zoning ordinance of the City of Los Angeles limited the number of dwelling units which could be erected on each acre of land. But if permission could be obtained for more units per acre, the value of the land would be greatly enhanced. The defendant Gibson began his efforts to obtain the necessary conditional use permit for a greater number of units, and on January 3, 1964, met with respect to that subject with the city councilman in whose district the land was then located.

After the planning commission of the city disapproved the application for the conditional use of the property, an appeal was taken to the city council. On October 19, 1964, the city council approved the desired conditional use. Ten councilmen voted favorably. In August 1965 the city attorney expressed the opinion that the permission as to the conditional use was no longer effective because construction had not been timely commenced. Thereafter a resolution was presented to the city council for the purpose of clarifying the terms of the original grant of permission. On November 10, 1965, the resolution received the approval of nine councilmen, but the city attorney ruled that ten affirmative votes were necessary. On December 14, 1965, a resolution clarifying the intent of the council to the effect that the conditional use was still effective was passed by the required ten votes.

The defendant Gibson succinctly states in his opening brief (references to the record being deleted herein) : "The theft charges against Gibson arose out of the fact that Griffin, Sr., and Griffin, Jr., each made available to Gibson $5,000 on October 1, 1964 (no theft alleged), $5,000 on October 15, 1964 (theft of over $200 alleged in Count II), and $7,000 on October 29, 1965 (theft of over $200 alleged in Count IV). As to

---

[2]In his opening brief the defendant states: "To make crystal clear the limited issue raised on appeal, appellant's argument will assume that *if* the evidence shows that Gibson made a false promise or representation to the Griffins, he did so with the intent to deceive the Griffins and the Griffins relied thereon and were in fact defrauded."

Count II, on October 15, 1964, Gibson, Griffin, Sr., and Griffin, Jr., each made out a check to cash for $5,000 on one of his own corporations, the checks were cashed and the $15,000 cash was put in a safe at Gibson's disposal and was at Gibson's request given to him in several installments. As to Count IV, a similar procedure was followed on October 29, 1965, except that the amount involved was $21,500, $7,500 from Gibson, $7,000 from Griffin, Sr., and $7,000 from Griffin, Jr.''

Mr. Griffin, Sr., testified that after the adverse action of the planning commission the defendant Gibson told him and Mr. Griffin, Jr., that he would have to have some money, saying that he ''needed it for changing of the zone and for political purposes.'' He did not tell Mr. Griffin, Sr., the specific use which would be made of the money. On one occasion, the defendant Gibson told Mr. Griffin, Sr., that he was not to know what use was being made of the funds. After the question arose as to whether the permission as to the conditional use had expired, the defendant Gibson told Mr. Griffin, Sr., that he would need more money for the same purpose, a portion of the witness' testimony being as follows: ''He said he had to take care of some of his political obligations and use the funds in connection with the zoning. I never knew where the money went.'' Mr. Griffin, Sr., never gave the defendant Gibson permission to use the money for any personal purposes whatsoever.

A portion of the testimony of Paul E. Griffin, Jr., was as follows: ''Bryan [Gibson, the defendant] stated that we could go in front of the City Council and request that they clarify their intent when they issued the first special use permit. He stated that we contended that the time had not run out, that it was not the intent of the City Council that we were to have 180 days, but that we had a year to get our first map of record. And we did not agree with the City Attorney's ruling. He said in order to go in front of the council, that he would need—well, again, this is a general—this is not his specific conversation—he stated that he would need approximately $20,000 relative to going in front of the council the second time.''

Mr. Griffin, Jr., further testified as follows: ''Q. . . . And do you recall his telling you at this conversation . . . one, two or three weeks before October 1st, 1964, that he [the defendant] had made some preliminary inquiries and, 'I've contacted several people and I've indicated to them that they'd get paid, and I think before we get through with the commitments that I've made, and with others that will come up, it is

going to run around $30,000.' Now, do you recall a conversation to that general effect? A. Yes, to that general effect, yes. Q. All right. And then didn't he also tell you that he would need the money in cash for the purpose of expediting this matter as that's the way they wanted their money? A. He said he would need the money in cash.''

Mr. Griffin, Jr., also testified as follows: ''Q. Do you recall also—you have also testified on direct examination that he [the defendant] said that, 'It's better if you don't know where the money was going,' or words to that effect. Do you recall you testified to that on direct examination? A. Yes, I know that—I don't remember the exact conversation or when it happened, but I was aware that this is—conversations that have taken place.'' At a later point in his testimony the witness stated that the defendant said he was to use the money as he saw fit with respect to what they were trying to accomplish and that he was not going to have to account for it.

Every councilman or former councilman, except one who had died, who voted on any occasion when the matter was before the council, testified as a witness. The record is devoid of any evidence in the nature of an offer to bribe or bribery or any form of improper influence brought to bear on any councilman or public employee.

Mr. Tapking testified that his occupation was that of a professional planner. He was employed by the Griffins and the defendant Gibson from April 1963 until April 1966 as the director of planning with respect to the Chatsworth property. The defendant indicated to him that Mr. Menveg would be assisting on the case. With respect to his own duties, Mr. Tapking testified: ''My duties were the same on the project, your Honor. I would present the case, make the presentations before the Planning Commission and the City Council, present the facts, and, if the case was approved, then assist the engineer on the preparation of a tentative map in accordance with the case that we had. In addition, I was given the authority to hire any planning consultants or architects that I needed in conjunction with the work that was pursuant. Consequently, I did hire Hai Tan to assist us. THE COURT: Let me direct you now to your contacts with the public officials. What were your instructions? THE WITNESS: I had no instructions relative to the contacts I made beyond the four councilmen. I took that upon myself and asked Mr. Gibson for permission to talk to these councilmen in an attempt just to

explain the case, and I indicated to him all I wanted to do was explain the case and nothing more.''

At a later point in his testimony Mr. Tapking stated: ''THE COURT: You were advised by Mr. Gibson that there were other persons who were under instructions to contact members of the City Council individually in order to persuade them to vote favorably on resolutions which would permit your project to be constructed? THE WITNESS: Yes. THE COURT: How did you receive that information? THE WITNESS: As I had indicated earlier, I had contacted Mr. Kanaster.'' A further portion of Mr. Tapking's testimony was: ''THE COURT: So the only persons that you are aware, now, from hearing from Mr. Gibson, were asked to contact individual members of the City Council, were Mr. Kanaster and Mr. Menveg and Mrs. Snyder? . . . THE WITNESS: Yes. THE COURT: Let me reframe that, Mr. Tapking. As of December 31, 1965, the only persons that you were aware of, besides yourself, that were involved in attempting to persuade individual members of the City Council to vote favorably for the resolution which would have clarified the intent of the 1964 resolution, were Mr. Kanaster, Mrs. Snyder, Mr. Menveg; is that correct? THE WITNESS: That is correct, sir.'' Later in his testimony Mr. Tapking stated that the defendant told him Mrs. Snyder's duties related only to public relations with respect to the Chatsworth property.

Mrs. Wyman, who had been a city councilwoman from approximately July 1953 to July 1965, testified that she received no campaign contribution from the defendant Gibson with respect to her campaign in 1965, except that at the presidential inauguration in Washington, D.C., in January 1965, Mrs. Snyder told her that she had a contribution of $1,000 in cash for her from the defendant Gibson and after the primary election in 1965 she received a further sum of $1,000 in cash from Mrs. Snyder, who said that the defendant Gibson wanted to help her again. Each contribution was unanticipated by Mrs. Wyman. After Mrs. Wyman was no longer a city councilwoman, the defendant Gibson called her about the Chatsworth property and asked her if she could be of any help with any of the councilmen with whom she might still be friendly. She replied that she did not think that she could be of much help and did not communicate with any councilman.

A councilman who was still in office at the time of the trial testified that he had been reelected at the primary election in April 1965. A portion of his testimony was as follows: ''A. I

received in '64, the last time I run [*sic*] for office, three checks, one payable to the Los Angeles Sentinel, one payable, I believe, to the South Side Journal, and one to the Los Angeles Sentinal, I believe, was $300. The one to the South Side Journal was $200, and one to Shelly Advertising Company, and it was $500, or a thousand dollars in all. . . . A. We received that from the Guardian Construction Company. Q. Did you at some time learn that was a company belonging to Mr. Gibson? A. I did. . . . A. They were received in '65. . . ."[3] The councilman further testified that he never talked with the defendant Gibson about any campaign contribution that was in any way connected with the discussion of the Chatsworth zoning problem. The witness also testified that on one occasion Mrs. Snyder came to his door and either said that she wished he would give some consideration to the matter or that he would study the file in the zoning case.

Mr. Post testified that he had known the defendant Gibson for five or six years. In October or November 1965 he spoke to one councilman about the zoning matter at the request of Mrs. Warschaw who was then the Democratic state chairman. He received no payment for what he did.

Mr. Kanaster testified that he had been a member of the Los Angeles County Regional Planning Commission for the preceding 10 years. In July 1964 Mr. Tapking telephoned him and asked him to come to his office to give advice about the pending matter. At Tapking's request he told Councilman Cassidy that Tapking wished to present details of the matter to him.[4] He received no fee for his services. A further portion of Mr. Kanaster's testimony was as follows: "I said to Mr. Gibson that in my conversation with Councilman Cassidy, I inferred or—I may be wrong. Councilman Cassidy may have mentioned the name of this Elizabeth Snyder—but, at any rate, I asked bluntly, 'Is Elizabeth Snyder being used by your firm in this particular matter?' The answer was, 'Yes,' . . ."

Mrs. Snyder testified that she had known the defendant Gibson for at least 10 years. In 1964 and 1965 she had "a public relations and advertising office." The defendant Gibson took her to view the Chatsworth property in a helicopter.

---

[3] At a later point in his testimony the witness said: "I only know that we got the letter from the Guardian Construction Company which said that Mr. Kanaster had contacted them concerning this. That way included with the checks that were mailed."

[4] At the trial Councilman Cassidy testified that he voted in opposition to the conditional use.

He asked her if she would talk to Councilman Cassidy in whose district the property was then located as a result of a recent redistricting. She talked about Mr. Gibson to Mr. Cassidy, whom she had known for many years, but she did not go into the merits or details of the zoning matter. Mrs. Snyder further testified that whatever she did was done as a friend and that she was not paid any money by the defendant in 1964, either in cash or by check, to contact anyone on the Los Angeles City Council. In 1965 she did ask Mrs. Sherwood, an employee of the office of the district attorney, to call a newly elected councilman. She neither offered nor gave Mrs. Sherwood anything of value for doing so.

Other portions of Mrs. Snyder's testimony were as follows: "Q. In 1965, were you, and by 'you' I mean you or your firm, retained to represent the builders in connection with the Chatsworth property? A. No. . . . Q. And in 1965 did you receive any funds, either by check or by cash, for any kind of work, public relations or otherwise, from Bryan Gibson for use in connection with the Chatsworth property? A. No. . . . Q. . . . In connection with 1964 and 1965, did you receive any funds, either cash or check, from Bryan Gibson for the purpose of contacting anyone in connection with this case? A. No."

Mrs. Snyder further testified that her recollection was that she was engaged in a campaign of a person running for mayor against the incumbent of that office in the spring of 1965 when the defendant first contacted her. In February or March 1965 the defendant Gibson gave her $5,000 in cash for that campaign. That was after she first saw the defendant with respect to the Chatsworth property. Furthermore, previously in January 1965, while she was attending the inaugural ceremonies in Washington, D.C., the defendant gave her $1,000 in cash for Councilwoman Wyman's campaign.

At a later point in her testimony Mrs. Snyder said that an invoice was sent to the ABC Investment Company in March of 1965 after a discussion with the defendant or his secretary, in which "our" secretary may have also participated. On the invoice was stated "exactly what we were asked to put on it, 'Chatsworth property, analysis and representation.' " It was in the amount of $1,000 and she received payment by check in March 1965, during the mayoral campaign. The invoice was attributed to the campaign and the money was "accredited" to that campaign. That was in accordance with Mrs. Snyder's understanding when she received the check from Mr. Gibson.

Councilman Shepard, in whose district the Chatsworth property had been prior to the redistricting which occurred approximately July 1, 1964, testified that the defendant made contributions of $3,000 to his campaign in 1965, but that such contributions did not influence his vote.

Mr. Menveg testified that his occupation was that of a realtor and insurance broker. He had known the defendant for about four or five years "politically." He was aware of the Chatsworth zoning matter. In 1964 and 1965 he assisted the defendant in connection with that problem. He went to see some members of the city council. Mrs. Snyder asked him to see a particular councilman. The defendant never gave him anything of value for his efforts, except that he gave him a fishing license at Christmas time. He received no compensation in 1964 or 1965 from Mrs. Snyder in connection with the zoning case. He did receive $2,000 in cash from her which he used in the mayoral campaign.

Mr. Menveg further testified that he met with Mr. Tapking on several occasions. Portions of his testimony were: "Q. Did you also attend any of the meetings in connection with the tract maps? A. I believe one meeting, yes. . . . A. Could have been more. . . . Q. . . . Do you recall attending any of the Planning Committee meetings having to do with the question of the resolution of intent that finally passed on December 14, 1965? A. I believe I did, yes. Q. How many of those meetings did you attend? A. I don't recollect. . . . Q. You do recall attending more than one meeting? A. Yes. Q. For what purpose did you attend those meetings? A. I believe Mr. Tapking had called me and told me that they were going to be there and asked me if I would be there with them. . . . Q. Why did you attend these meetings at Mr. Tapking's request, if you weren't paid? A. Because Mrs. Snyder had asked me to help Mr. Gibson, and I was doing it through the friendship that I had had with Liz Snyder. Q. That was back in 1964, that Elizabeth Snyder had asked you to help Mr. Gibson? A. Right. Q. So whenever Mr. Gibson called upon you, you helped him? A. Yes, to the best of my— Q. That was out of friendship for Elizabeth Snyder and out of friendship for Bryan Gibson? A. Yes. Q. Without any compensation at all? A. That's correct."

Mrs. Sherwood, an employee of the office of the district attorney, testified that Mrs. Snyder asked her to call a newly elected councilman on behalf of the defendant. She did so and "put in a testimonial about Mr. Gibson." She did not

personally know Mr. Gibson. She received nothing of value or any promise thereof for her act.

Mrs. Warschaw testified that she knew the defendant. He gave her nothing of value or any promise thereof in return for her conversation with one of the councilmen.

The defendant Gibson neither testified nor called any witness on his own behalf.

The core of the defendant's argument as to the insufficiency of the evidence is expressed in his opening brief as follows: "It is submitted that the evidence falls woefully short of proving beyond a reasonable doubt that Gibson did not spend the funds made available to him for lobbying and political purposes even if it be assumed that such proof would be sufficient to prove the falsity of his representations to the Griffins. The announced belief of the prosecution was that it could prove grand theft by 'putting on the likely people who would have been the objects of the moneys' and proving that they did not receive it. [Citation to the record.] The prosecution must prove that all the money did not go to one or more of the persons to whom Gibson was authorized to give it, not simply that all of the money did not go the [sic] those most 'likely' to have received it. This the prosecution did not do. All of the money for which the prosecution did not account could have gone to one or more of the following persons and there is no evidence that it did not: 1. The president of the Chatsworth Chamber of Commerce for some local project. 2. A person or public relations firm for obtaining signatures on petitions, for generating community support and for inducing citizens to make telephone calls and write letters in favor of the Chatsworth project." Other categories of possible recipients are then listed in the brief, such as the opponents of certain councilmen in 1965, the opponent of the incumbent mayor through a person other than Mrs. Snyder, friends of favorable councilmen who were running for county, state or national offices, the political party of favorable councilmen who might expect to be candidates for higher offices in the future, and other councilmen through anonymous campaign contributions.

In determining the merits of defendant's contention that the evidence was insufficient to show the falsity of any pretense or representation made by him to the Griffins as to the use of the cash, guidance is found in the statement of law set forth in *People* v. *Otterman*, 154 Cal.App.2d 193, at page 204 [316 P.2d 85]: "While mere nonperformance of a promise is not enough to constitute a fraudulent pretense within the

law of grand theft (*People* v. *Ashley,* 42 Cal.2d 246, 263-264 [267 P.2d 271]), a promise made with intent not to perform does constitute a false pretense (*People* v. *Weitz,* 42 Cal.2d 338, 343 [267 P.2d 295]), and the question of intent to defraud is one of fact (*People* v. *Frankfort, supra,* 114 Cal.App. 2d 680, 697, 698 [251 P.2d 401]); the nonperformance is a circumstance to be considered with all others in deciding whether the intent to perform was absent at the time of making the promise. (See *People* v. *Frankfort, supra,* at p. 698; *People* v. *Rocha,* 130 Cal.App.2d 656, 661 [279 P.2d 836]; *People* v. *Pond,* 44 Cal.2d 665, 672 [284 P.2d 793].)''

The defendant Gibson stated to his associates, the Griffins, that he needed the money to obtain a successful result when the zoning matter would be before the city council for determination by vote of its members. Although the record shows that some councilmen actively espoused the conditional use application, the evidence was sufficient to sustain the inference that no part of the funds was received by any councilman with relation to his vote as to the matter. If it be assumed that the campaign contributions of various sorts to which reference has been made hereinabove came in whole or in part from the moneys received by the defendant from the Griffins, such contributions represented at most only a portion of those moneys. The testimony showed that in the zoning matter the defendant Gibson received the active support of persons who were in a position to be influential in the matter, namely, Mr. Kanaster, Mr. Menveg, Mrs. Snyder and Mrs. Warschaw, but the evidence of those witnesses sustained the inference that the defendant Gibson did not use any of the funds in question for the purpose of compensating any of them for their respective efforts or services. The extent of the influence attempted to be exerted or actually exerted on the members of the city council was explored at length in the course of examination of witnesses at the trial. The evidence was of such a nature as to warrant the trial judge as the trier of fact in reaching the inference that the defendant had not used the funds to any substantial extent in the employment or compensation of other persons in his endeavors to achieve the goal for the attainment of which he had represented to the Griffins that the money was necessary.

It is, of course, true that no adverse inference could properly be drawn by the trier of fact from the failure of the defendant Gibson to testify personally. But that principle of law did not preclude the trier of fact from drawing an infer-

ence unfavorable to the defendant because of his failure to call other witnesses to testify as to matters relevant to the expenditure of funds in pursuit of the purposes for which they were represented to the Griffins to be necessary. In short, the defendant chose to leave unexplained by any third person as a witness the substantial case of the People that as to each count of which he was convicted more than $200 of the funds had not been used for the represented purposes. (See *People* v. *Burns,* 270 Cal.App.2d 238, 247 [75 Cal.Rptr. 688].)[5]

As has been noted hereinabove, nonperformance is a circumstance to be considered with all others in deciding whether the intent to perform was absent at the time of making the representation. (*People* v. *Otterman, supra,* 154 Cal. App.2d 193, 204.) The testimony that the defendant Gibson insisted that he not be required to account for his use of the money and the evidence as to the limited nature of the expenditures made by him justified the trier of fact in reaching the conclusion that the defendant Gibson falsely represented the purposes for which the funds would be used and that he misapplied them for his own personal purposes.

■ A review of the record establishes that the evidence was sufficient to sustain the convictions of grand theft under the governing law which was expressed in *People* v. *Bassett,* 69 Cal.2d 122, at page 139 [70 Cal.Rptr. 193, 443 P.2d 777], as follows: ''The same standards control, *a fortiori,* when it is a criminal judgment which is challenged on the ground of the insufficiency of the evidence. In resolving that contention the appellate court is required to determine whether a reasonable

[5]In *Burns* at the page cited the court stated: ''Neither defendant nor his codefendant testified at the trial. In his argument the prosecutor noted a number of times that all of the evidence was given by witnesses for the prosecution, that the evidence had not been explained, and that no evidence had been produced which pointed to the innocence of defendants. Counsel for defendant's codefendant objected to this type of argument on the part of the prosecutor. Defendant now contends on appeal that the comments of the prosecutor constituted constitutional error under the rule of *Griffin* v. *California,* 380 U.S. 609 [14 L.Ed.2d 106, 85 S.Ct. 1229] which forbids any comment by the prosecution on a defendant's silence or instructions by the court that such silence is evidence of guilt. Defendant claims that the statements of the prosecutor were in effect indirect comments on his silence. . . . The California cases recognize that the rule of *Griffin* prohibits reference to a defendant's failure to take the stand in his own defense, but hold that the rule does not extend to comments on the state of the evidence or on the failure of the defense to introduce material evidence or to call logical witnesses. [Citations.] The comments in the instant case reflect only on the state of the evidence. Therefore, we perceive no error in the argument of the prosecutor.''

trier of fact could have found that the prosecution sustained its burden of proving the defendant guilty beyond a reasonable doubt. [Citations.] The prosecution's burden is a heavy one: 'To justify a criminal conviction, the trier of fact must be reasonably persuaded to a near certainty. The trier must therefore have reasonably rejected all that undermines confidence.' (*People* v. *Hall, supra,* [62 Cal.2d 104] at p. 112 [41 Cal.Rptr. 284, 396 P.2d 700].) Accordingly, in determining whether the record is sufficient in this respect the appellate court can give credit only to 'substantial' evidence, i.e., evidence that reasonably inspires confidence and is 'of solid value' as the court said in *Estate of Teed* [112 Cal. App.2d 638, 644 (247 P.2d 54)].''

 In the present case the evidence was sufficiently broad in scope and substantial in character to justify a reasonable trier of fact in determining that the prosecution had sustained its burden of proving the defendant Gibson guilty beyond a reasonable doubt of grand theft as charged.

The judgment (order granting probation) is affirmed.

Appellant's petition for a hearing by the Supreme Court was denied September 24, 1969. Peters, J., and Burke, J., were of the opinion that the petition should be granted.