[Crim. No. 2588.   Third Dist.   Apr. 14, 1955.]

THE PEOPLE, Respondent, v. DEMPSEY CAMPBELL et al., Appellants.

Dempsey Campbell and Joe Teller, in pro. per., for Appellants.

Edmund G. Brown, Attorney General, Doris H. Maier and F. G. Girard, Deputy Attorneys General, for Respondent.

SCHOTTKY, J.—Appellants above named and one Joseph McKay were charged with a violation of Penal Code, section 459, burglary, and a violation of section 182, conspiracy to commit burglary. Each appellant was also charged with a prior felony conviction. Appellants entered pleas of not guilty to both counts, and admitted the prior convictions. Thereafter a jury trial was had, during the course of which defendant Joseph McKay entered a plea of guilty, and at the conclusion of which both appellants were found guilty on both counts. This appeal is from the judgments of conviction entered on said verdicts.

Appellants have filed a lengthy brief in propria persona and their principal contentions appear to be (1) that the evidence is insufficient to sustain the conviction, (2) that they were placed in double jeopardy because they were charged with and convicted of the crime of burglary and the crime of conspiracy to commit burglary, (3) that there was error in the instructions, and (4) that they did not receive a fair trial and were not adequately represented by counsel.

Before discussing these contentions we shall give a brief summary of the evidence as disclosed by the record.

On April 16, 1954, at approximately 11 p. m., a Santa Rosa police officer was walking along Third Street of that city, making a routine check of the downtown business establishments. As he checked the Western Stores he noticed that a service (garage) door was slightly ajar. The door swings up and it was about three inches from being all the way down. The officer then heard what he described as ''metallic noises . . . steel on steel or iron on iron'' coming from within the building. At this point another city police officer arrived in a police vehicle. A radio call to the Santa Rosa city police station resulted in the arrival of police reinforcements within a matter of minutes. The reflection of a flashlight from within the store was observed.

Officer Carl Meister climbed a fire ladder on an adjacent building and from this vantage point he had an unobstructed view of practically the entire roof of the Western Stores. As he climbed the last section of the ladder he observed a man

going along the top of the roof. The man then proceeded to the roof's edge and peered down towards the street. Meister described this man as being approximately of his own age and size, wearing matching light shirt and pants. Meister could not positively identify the person he saw on the roof and did not positively identify appellant Campbell as the man on the roof, but Meister testified that when Campbell was arrested a couple of days after the burglary he was wearing matching pants and shirt, tan in color. Meister stated that he thought Campbell was shorter and younger than he was, but of approximately the same size and age. When the man on the roof had approximately returned to the place where Meister had first seen him, Meister called out for him to hold it, turned his flashlight on and pointed it at the person. The individual then moved fast, disappearing from Meister's view, and shortly thereafter Meister heard a sound of glass breaking. It was ascertained that the man had descended through a skylight to the interior of Western Stores.

Another officer looked down the skylight into the building and yelled down to the burglars, identifying himself as a police officer, advising them that they were surrounded and telling them to come out with their hands raised. Within a couple of minutes the roar of an automobile engine was heard from within the service area of the Western Stores and then a car with at least two occupants crashed out of the building, splintering the wooden service door, and proceeded to flee from the scene. An officer fired four shots into the fleeing vehicle. It was established that the vehicle was a dark 1940 or 1941 Buick.

An examination of the Western Stores showed that an 800 to 1,000 pound safe had been moved approximately 70 feet from its place in the office to the service area of the store. Prior to the burglary this safe's location was on top of another safe in the office. The bottom of the safe had been peeled off in an unsuccessful attempt to open it. A shotgun, two hydraulic jacks, a pair of tin snips, and a set of socket wrenches had been removed from the retail counters and taken to the service area. A mattress had been taken from the service area and placed on the floor of the office.

At approximately 11 a. m. on April 16, 1954, Campbell, Teller and McKay were observed in a tavern in Santa Rosa; they ordered two beers, conversed among themselves for about ten minutes and then left. Upon leaving the bar, Campbell

got into a Kaiser automobile and drove toward downtown Santa Rosa, followed by Teller and McKay in a dirty "Buick or Pontiac." Later that day, at approximately 9 p. m., Campbell and Teller were observed together at a Santa Rosa service station. Campbell was in the closed area of the station purchasing some points for a 1941 Buick, Teller was just outside the station office, within the service station area. In response to a question by an employee as to whether he could be of assistance, Teller replied, "Hell no." Teller nodded to Campbell and they both got in a 1941 Buick. Another man was in the car, but, due to insufficient lighting, it was not possible to positively identify him. The car then left the service station in the general direction of Western Stores.

On the morning following the burglary, at approximately 8:30 o'clock, Campbell and Teller were observed in Campbell's Kaiser, which was parked on a county road directly behind the 1940 or 1941 Buick which had shattered the service door of the Western Stores in the successful escape. The Buick was partially off to the side of the road and McKay was standing by it, apparently wiping a flashlight with a cloth. Approximately an hour later these same parties were observed entering Campbell's apartment.

Teller did not testify in his own behalf. However, his wife testified to the effect that on all relevant periods in question he was in San Francisco. A bartender also testified that Teller was in his establishment in San Francisco from approximately 12:30 p. m. until 3 p. m. on April 16, 1954. In a statement given to the authorities by Teller shortly after his arrest, he admitted knowing McKay, denied having been in Santa Rosa during the past few years and stated that he was at his home in San Francisco during the time in question.

Campbell took the stand in his own defense and testified that on the night of April 16, 1954, he had had several beers in various taverns in Santa Rosa and had walked home at approximately 10:30 p. m. He denied having been in the presence of Teller and McKay at the tavern earlier that day, and denied having been in the service station with Teller. As to the identification of him in the parked Kaiser near the escape vehicle, he testified that McKay had contacted him early in the morning of April 17, 1954, and had informed him that he would need assistance in getting his car started. Campbell stated that he agreed to assist McKay and that he, McKay, and an unidentified friend of McKay, called Tom, drove to the place where the Buick was stalled. He said

that he got out, observed the bullet holes in the car, and chastened McKay for subjecting him to the risk of becoming involved in something which he was unaware of and didn't want to know about. He then drove off, leaving McKay and his friend near the Buick. He testified that Teller was not with him at the time, nor had they been together at any time during the relevant periods. In a statement given to the authorities at the time of his arrest, Campbell informed them that he had done a little drinking on the night of the 16th, that he had arisen on the morning of April 17, 1954, about 7:30 or 8, had fooled around for a little while and then had gone to San Francisco. In response to a question by the officers as to where he had got the money to buy his Kaiser, he replied: ''I won it at the races; I had a lucky day . . . you don't think I am crazy to use my own car on a job, do you?'' It was shown that Campbell had previously resided in a hotel which was adjacent to the store that was burglarized.

Upon an appeal in a criminal case the appellate tribunal must assume in favor of the verdict the existence of every fact which the jury would reasonably have deduced from the evidence and then determine whether the guilt of a defendant is deducible therefrom. (*People* v. *Newland,* 15 Cal.2d 678 [104 P.2d 778].) Bearing this familiar rule in mind we are convinced that the evidence is sufficient to sustain the conviction of appellants on both counts.

As to the burglary count, appellants were seen at a Santa Rosa service station two hours before the burglary was discovered. The physical evidence of the burglary clearly showed that it was not accomplished within a matter of minutes. Records and files in the office had been disrupted; a mattress had been taken from the service area of the store and placed on the floor of the office. An 800 to 1,000 pound safe, which rested on the top of another safe, had been removed from its place in the store office to the service area of the store, a distance of approximately 70 feet; the bottom of the safe had been peeled off; tools were taken from the retail shelves to the service area and were probably used in the unsuccessful attempt to open the safe. A lookout was observed on the roof of the store; positive identification was not possible, but the man appeared to be of the approximate age and size of appellant Campbell; also, he was dressed in clothes which were somewhat similar to the ones worn by Campbell at the time of his arrest a couple of days later. Apparently

the Buick car which appellants were observed getting into at the service station around 9 p. m. was the same Buick car that was driven from within the service area of the Western Stores into and through the service door in the successful escape. At least two men were in the car, crouched as low as possible, at the time it splintered the service door. No positive identification was made. But at 8:30 the following morning appellants and McKay were observed at the scene where the Buick was abandoned, following its successful flight from the burglary. About an hour later appellants and McKay were observed together, entering Campbell's apartment. While appellant Teller did not testify in his own behalf, he had informed officers that he was not in Santa Rosa during the relevant periods. Appellant Campbell's testimony merely conflicted with that given by prosecution witnesses. Also, his response to the question by the officers as to the condition of his car was given *prior* to any mention of a vehicle being used in the burglary. The incriminating circumstances of this statement could be considered by the jury.

As to the conspiracy counts, in order to sustain a conviction it is necessary to prove an unlawful agreement to commit a crime, accompanied by an overt act in furtherance of such agreement. (*People* v. *Daener*, 96 Cal.App.2d 827 216 P.2d 511]; *People* v. *Benenato*, 77 Cal.App.2d 350 [175 P.2d 296].) The crime may be established solely by circumstantial evidence (*People* v. *Sica*, 112 Cal.App.2d 574 [247 P.2d 72], and it is not necessary to prove that the parties actually came together and reached a formal agreement. (*People* v. *Griffin*, 98 Cal.App.2d 1, 42-43 [219 P.2d 519]; *People* v. *Steccone*, 36 Cal.2d 234 [223 P.2d 17].) In the light of the above rules it is apparent that the jury's finding of an agreement was warranted by the following facts.

Teller and McKay arrived in Santa Rosa from San Francisco; on the morning of the burglary, Campbell, Teller and McKay were observed in a Santa Rosa tavern engaged in conversation; and when they left this tavern they headed in the direction of the Western Stores, Campbell in his Kaiser, followed by Teller and McKay in a Buick or Pontiac. Appellants and an unidentified man were observed together in a service station about two hours before the crime's discovery; their manner could be classed as suspicious; and when they left the service station they headed in the direction of the Western Stores in the Buick which played such a vital part in the crime. From the nature of the crime it is

apparent that it was a deliberated, planned affair and not a spontaneous act. On the morning following the burglary, appellants and McKay were observed at the scene where the escape vehicle had been abandoned; McKay was holding a rag, apparently wiping a flashlight, appellants were sitting in Campbell's Kaiser; and about one hour later all three were observed entering Campbell's apartment in Santa Rosa. As to the establishment of the overt act, the evidence would support a conclusion that appellant Teller and McKay arrived in Santa Rosa from San Francisco and contacted appellant Campbell for the purpose of planning and/or committing the crime. Moreover, the evidence shows that in furtherance of the conspiracy, appellants had provided a plan of escape which apparently included abandonment of the escape car and return to Santa Rosa in a car (Campbell's Kaiser) which was not involved in the crime. This was carried out as planned.

We are satisfied that the record shows substantial evidence of the conspiracy and of the overt act in furtherance thereof.

There is no merit in appellants' contention that, because they were charged with and convicted of the crime of burglary and the crime of conspiracy to commit burglary, they were placed in double jeopardy. ■ It has long been settled that a conspiracy is a distinct offense from the actual commission of the offense forming the object of the conspiracy and that guilty parties may be legally convicted of both offenses. (*People* v. *Keene,* 128 Cal.App.2d 520, 528-529 [275 P.2d 804]; *People* v. *Hoyt,* 20 Cal.2d 306, 316-317 [125 P.2d 29].)

Appellants contend also that the court committed error in giving certain instructions to the jury. They complain that they were prejudiced by the court's instructing the jury that the defendants were entitled to each juror's separate, individual opinion as such; and that a witness found to be wilfully false in one part of his testimony is to be distrusted in other parts of such testimony; and also that the degree of burglary, if any, was second degree. Appellants have set out in their brief all of the instructions given by the court and a reading of them convinces us that the jury was fully and correctly instructed. In fact, the instructions appear to be extremely fair to appellants and singularly free from error.

With reference to appellants' final contention that they did not receive a fair trial and were not adequately repre-

sented by counsel, it is apparent from the record that these contentions are entirely without merit. Because of the fact that appellants have made these contentions and have filed their brief in propria persona we have made a careful study of the record and it is clear that appellants were represented at the trial by able counsel who were vigorous in their cross-examination of the witnesses for the people and who apparently endeavored to present evidence favorable to defendants. It should be stated also that the trial judge was eminently fair in his rulings, and that the rights of appellants were protected by the court and counsel insofar as it was possible to protect them.

In view of the foregoing we conclude that the evidence adequately supports the verdicts and that no prejudicial error was committed.

The judgments are affirmed.

Van Dyke, P. J., and Peek, J., concurred.

A petition for a rehearing was denied April 26, 1955.