[Crim. No. 11313.   Second Dist., Div. Three.   July 6, 1966.]

THE PEOPLE, Plaintiff and Respondent, v. CHARLES ALVIN WHEELER, Defendant and Appellant.

Lawrence J. Crow, under appointment by the District Court of Appeal, for Defendant and Appellant.

Thomas C. Lynch, Attorney General, William E. James, Assistant Attorney General, and Bradley A. Stoutt, Deputy Attorney General, for Plaintiff and Respondent.

KAUS, J.—After a court trial defendant Wheeler was found guilty of a violation of Penal Code, section 464 (burglary with explosives). A motion for new trial was denied, as was probation.

The record shows that originally defendant was charged jointly with one Philip W. Steward. At the time of the trial in this matter the information against Steward had been set aside after a motion under Penal Code, section 995. He was, however, subject to a renewed effort on the part of the prosecution.

Although defendant argues strenuously that the evidence does not support the conviction, there is no merit whatever to the point. The following is an outline of the rather impressive case against him.

The premises burglarized were those of the Eastside Dairy Farms at 2929 North Durfee Road, situated in unincorporated county territory.

Martin Bosnyak the president of the dairy arrived in his office at about 3:50 a.m. on December 15, 1964. There were several tools lying around the office safe, the safe's knob was on the floor, there was a torch-cut on a door of the safe and about $40 in "petty change" was missing. Officer Cataldi who arrived at about 5:30 a.m. found that the safe was still warm to the touch at that time.

Lewis Montrone, a milk truck driver, was let into the premises of the dairy at about 3:40 a.m. As he approached the "drivers' room" which is in the same building as the offices, he noticed that the lights were off, which was unusual. The office building is in about the center of the south portion of the premises, which are rectangular in shape and lie to the west of Durfee. Empty bottles are stored in the southwest corner. Montrone heard the bottles rattling and ran in their direction. He noticed that whoever had been there had got away. "Instinct" then made him reverse his direction and head back east. A chain link fence with barbed wire on top runs along

the southerly border of the dairy property and Montrone then observed Wheeler for several seconds on the other side of the chain link fence climbing over a picket fence. Wheeler was about 15 feet away from him and facing sideways. Montrone yelled at him, Wheeler hesitated, stopped and looked at him. Montrone climbed over the chain link fence, but the person whom he had seen got away.[1]

There was much testimony throughout the trial concerning the lighting conditions at the time. It was conflicting and the court obviously accepted the version of the prosecution.

Montrone later picked defendant from a group of six or seven persons in a police lineup.

After the incident by the fence Montrone loaded his truck to start his deliveries. As he proceeded south on Durfee he noticed a green Chevrolet—later proved to be Steward's—a block to a block and a half from the dairy. He looked at it and returned to the dairy, arriving more or less simultaneously with the police. He had made a note of the license number and reported the matter to the police. He set out on his route again and when he passed the area where the Chevrolet had been parked, it was gone. He had talked to the officers about 15 minutes.

---

[1]This seems as good a place as any to remind our readers—though by now they consist only of attorneys and judges who read dull footnotes in not very important opinions—that a record on appeal should to the fullest extent possible tell the appellate court what went on below. In the present case at the oral argument before us counsel for defendant accused the Attorney General of misstating the record concerning Montrone's movements before he saw defendant. Counsel was correct, but the error is quite trivial, surely unintentional and wholly understandable in the light of what happened below: the trial started with a diagram of the dairy already prepared. Various witnessse orally described certain additional physical features and their own movements. Often the record simply says: ''I went here. (Indicating.)'' This means nothing to us. Nor is it more helpful if the witness is asked to draw an ''X,'' a line or an arrow, when—as happened here—he himself and several succeeding witnesses do it several times and the various marks are in no way identified by letters or numbers. Acceptable methods of making an intelligible record are described in Fricke, Planning and Trying Cases (1957) pp. 84-87, 335-339; 3 Busch, Law and Tactics in Jury Trials (1960) section 334, p. 243 and 1 Schweitzer, Cyclopedia of Trial Practice, section 271, footnote 8. We are satisfied that after many tedious hours of reading, rereading, crosschecking and eliminating absurdities we understand the testimony, but the same result could have been achieved at much less loss of collective time, if our problems had been appreciated below. It appears to be the law that inability on the part of the appellate court to understand the proceedings below should result in an affirmance on the ground that the record fails to show error. (*Montanez* v. *Beard*, 108 Cal.App. 585, 589 [291 P. 896].) In criminal cases the principal burden on making an adequate record thus rests on the shoulders of defense counsel.

Defendant was arrested the same morning at 7 a.m. at Steward's home in Covina by Deputies Cataldi and Connors. The Chevrolet was parked in front of the house. The next day, according to the deputies, defendant was advised of his right to counsel, of his right to remain silent and that anything that he might say could be used against him in court.[2] Defendant denied that he had burglarized the dairy. Asked where he had spent the night in question he said "that he had gone to the home of Shelly and stayed all night." Shelly lived right behind Steward on Valencia in Covina. He said he had known Steward for three or four months. The officer then told defendant that they had talked to Shelly and that she had said that defendant did not arrive at Steward's place until the very early morning of December 15. Defendant said: "Well, I guess that blows my story." To the officer's suggestion that he try another story, defendant said he would, if his attorney told him to.

At the time of his arrest at Steward's residence defendant was fully clothed. Steward was arrested on the same occasion.

That, in essence, was the People's case when the prosecution rested. Not very strong, perhaps, but like good wine it improved as the trial dragged on through seven days. What helped it immeasurably was the nature of the defense and the opportunity it gave the prosecution on rebuttal.[3]

The defense, which was obviously not believed by the court, amounted to this: in the evening of December 14 Steward appeared at defendant's home, which was very near the dairy, on foot. He had left his car on Durfee because it had "missed." Defendant and Steward spent the evening playing pool in Downey and Inglewood. They left Inglewood between 3 and 3:30 a.m. and proceeded to Steward's car on Durfee where they arrived between 4 and 4:30. Defendant raised the hood, checked the coil wire and found it to be in order. Steward stated the car, which then was not missing as badly as before, but still missing. Defendant then followed Steward to his house in Covina, both stopping at a restaurant on the way. They

---

[2] The giving of this advice and the incriminating import of the ensuing conversation were denied by defendant.

[3] No question is raised by defendant that the rebuttal evidence could perhaps have been introduced by the People as part of their case in chief because of the fact that he was found in Steward's company, at an unusual time, shortly after the burglary. (*People* v. *Harrison*, 59 Cal.2d 622, 628-629 [30 Cal.Rptr. 841, 381 P.2d 665]; *People* v. *Pike*, 58 Cal.2d 70, 92 [22 Cal.Rptr. 664, 372 P.2d 656]; *People* v. *Carter*, 48 Cal.2d 737, 753-754 [312 P.2d 665]; McK. Dig., Criminal Law, § 286.)

arrived at Steward's house between 5:30 and 5:45 a.m., had a cup of coffee and at 7 a.m. the officers came to arrest them.

After this defense had been presented and to some extent corroborated, the People embarked on a course of destroying it by proving Steward's implication in the crime. The effect of this proof was, of course, twofold: first of all, to the extent that the prosecution proved that Steward had committed the burglary, either alone or with someone else, it impeached the alibi by proving that whatever defendant had been doing that night, he had not done it with Steward; but further, the court could accept defendant's testimony to the effect that he had been with Steward, but disregard his assertion that at the time of the burglary they were somewhere between Inglewood and the dairy. Without going into detail, and certainly without intimating in the slightest that the evidence against Steward would have been sufficient to convict him, the following evidence was produced:

1. Deputy Sheriff Martin who had observed the 1954 Chevrolet at 12:45 a.m.—four hours after Steward supposedly left it on Durfee—felt the radiator at that time and it was "quite warm" as if the vehicle had been running within the last half hour.[4]

2. Steward had briefly been an employee of the dairy in 1962.

3. Steward's handwriting appeared on the same sheet of paper which contained a rather accurate drawing of the dairy property, on which the location of the safe was shown by a dollar sign and over which he had written, among other things: "Eastside Dairy 30,000-40,000 at last of month." The diagram also showed a car parked in front of the dairy. Although there was no evidence produced when and how this diagram was obtained by the prosecution, or when it was prepared by Steward, it is an obvious inference from the matters contained thereon that it was intended as a blueprint for a future burglary.

4. The morning after the burglary a fresh footprint was discovered in a strawberry patch in the general area where Montrone had observed defendant. A plaster cast of that foot-

---

[4]There is an aura of mystery in the record concerning the location of this Chevrolet. According to Martin he saw it at 4845 Durfee Road, which if the street numbering in the area is consistent with the practice in the rest of the county would put it about 19 blocks north of the dairy. On the other hand everybody agrees that it was parked a short distance south. Since defendant makes nothing of this matter, we assume that 4845 should read 2845.

print was compared with a shoe which Steward was wearing at the time of his arrest. According to a forensic chemist employed by the Los Angeles County Sheriff's Office, the "shoepoint" [print?] depicted by the plaster cast was similar in size, shape, type and in a worn area on the outside part of the heel as the shoe itself. It was his opinion that the print could have been made by the shoe.

Defendant's first contention is that the evidence is insufficient to support the conviction. In support thereof he cites certain discrepancies in Montrone's testimony, differences between the description which that witness first gave to the police and physical characteristics of defendant and dissimilarities between the clothing of the person he observed and that worn by defendant at the time of his arrest. Obviously these matters were for the trier of facts to resolve. Reference is made to certain clues which might have led to a different culprit and which the police should have pursued. This is just another argument which should have been addressed—and undoubtedly was—to the trial court.

It is admitted that someone committed a burglary which falls within the definition of Penal Code, section 464. Defendant was seen fleeing from the scene of the crime shortly thereafter. He was arrested three hours later, fully dressed, at the home of a person whose car had been seen standing in the vicinity of the crime very shortly after the burglars were flushed and, when interrogated after a then sufficient caution, he gave a false explanation of his whereabouts. In addition there was evidence that the person with whom he claims to have been many miles away at the critical time planned the burglary in writing, had been an employee of the dairy in the past and, at the time of his arrest, wore a shoe which could have left a fresh footprint in a strawberry patch next to the burglarized premises. Admittedly this is all circumstantial evidence, but this is common in prosecutions such as this, since burglars rarely invite witnesses and the victim is a building, not a person. (*People* v. *Jordan*, 204 Cal.App.2d 782, 786 [22 Cal.Rptr. 731] ; *People* v. *Colletta*, 100 Cal.App.2d 1, 5 [222 P.2d 922].) It is also settled that each such case must rest upon its own facts. (*People* v. *Jordan, supra*, p. 789.) While no case has been found combining the precise elements pointing to guilt which are present here, the cases cited in the footnote are reasonably similar. In each the contention that the evidence did not support the conviction was rejected, al-

though it appears to us that in some the facts were weaker than here.[5]

Defendant cites *People* v. *Hall*, 62 Cal.2d 104 [41 Cal.Rptr. 284, 396 P.2d 700]. It is useless to compare the facts in that case—a prosecution for murder—with those before us. Suffice it to say that we see no reason why the trial judge—to paraphrase *Hall*—could not be "reasonably pursuaded to a near certainty" that Wheeler was guilty, nor do we believe that he unreasonably "rejected all that undermines confidence" in his guilt.

Defendant complains that Officer Cataldi was permitted to testify as quoted in the footnote, while being cross-examined by defense counsel on the subject of reasonable cause to arrest Steward.[6]

We think that defendant is simply mistaken in his interpretation of the officer's testimony. The "same individual" who returned to the vehicle was not Wheeler but Montrone, who did just that according to his testimony.

Next, complaint is made that defendant was arrested without reasonable cause. That contention was also raised at the trial but expressly abandoned by defense counsel, with a reservation of the right to renew it at a later time. Our study of the record does not show that the question of Wheeler's arrest, as distinguished from Steward's, was ever again raised.[7] There

[5]*People* v. *Alvarez*, 222 Cal.App.2d 748 [35 Cal.Rptr. 429]; *People* v. *Jordan, supra*; *People* v. *Heim*, 196 Cal.App.2d 1 [16 Cal.Rptr. 277]; *People* v. *Hicks*, 175 Cal.App.2d 556 [346 P.2d 452]; *People* v. *Robinson*, 146 Cal.App.2d 310 [303 P.2d 633] and *People* v. *Campbell*, 132 Cal.App.2d 262 [281 P.2d 912]. We are aware of the fact that the remittitur in *People* v. *Campbell* was recalled on January 7, 1966. (*People* v. *Campbell*, 239 Cal.App.2d 252 [48 Cal.Rptr. 603].)

[6]"In conjunction with Mr. Montrone or Deputy Martin, advising me that an eye-witness had seen an individual run from the location; that this same individual had seen a 1954 Chevrolet, green in color, parked at that approximately a block or so south of the Dairy at some time prior to his arriving at work; that after chasing the suspect, *the same individual had returned to the vehicle*, and the vehicle was gone; that the officer at the present time— . . . —advised me that the engine was hot when he had checked it."

[7]Steward's arrest produced at least one piece of tangible evidence, his shoe, Wheeler's only the incriminating conversation with Officer Cataldi. When defense counsel abandoned his contention that Wheeler was illegally arrested, the prosecutor had persuaded him that his point had no merit in view of *People* v. *Freeland*, 218 Cal.App.2d 199 [32 Cal. Rptr. 132].

The question whether *Wong Sun* v. *United States*, 371 U.S. 471 [83 S.Ct. 407, 9 L.Ed.2d 441], a case which has been subject to many different interpretations, makes voluntary statements made after an illegal arrest inadmissible solely because of the illegality of the arrest without accompanying "oppressive circumstances" was not discussed in *Freeland*. The point was expressly left open in *People* v. *Bilderbach*, 62 Cal.2d

was considerable wrangling below concerning the propriety of Steward's arrest, but even the most charitable reading of defendant's brief before us does not disclose that he now complains that the trial court was in error in admitting the shoe and other evidence obtained from Steward.

■ Finally defendant makes vague complaints of being denied due process by reason of the following:

While on rebuttal, the People called Steward as their witness. Without claiming the privilege against self-incrimination and without being advised by the court, he gave his name and address, testified that he knew ''Shelly'' and that at the time of the burglary she lived directly behind his house. At the prosecutor's request he drew a sketch showing the location of his house in Covina with respect to the San Bernardino freeway and other streets. He printed the names of various streets. He sketched in the location of Shelly's house. He was asked to write the word ''Shelly.'' At that point the court advised him of his constitutional rights and Steward decided to seek the advice of counsel. He was excused. Later he appeared with an attorney. On the advice of counsel he then refused to answer any additional questions. The reporter's transcript of Steward's initial appearance does not indicate that he was asked to write his name in longhand on the diagram that he drew, but he apparently did so next to the rectangle designating the location of his home.

Later during the trial the People produced an examiner of questioned documents. This witness had before him the following papers: 1. The sketch drawn by Steward on the witness stand; 2. an Employee's Withholding Exemption Certificate signed by Steward when he had briefly worked for the dairy; 3. an interview record, which is a form used by the Los Ange-

---

757, 766-767, footnote 5 [44 Cal.Rptr. 313, 401 P.2d 921]. *People* v. *Govea*, 235 Cal.App.2d 285, 304 [45 Cal.Rptr. 273] seems contra to *Freeland*. The federal courts, too, have had their problems in this area. Compare *Collins* v. *Beto*, 348 F.2d 823 with *United States* v. *McGavic*, 337 F.2d 317. See also the interchange between the Supreme Court of Errors of Connecticut and the United States Supreme Court following the conviction of one Traub for arson. (*State* v. *Traub*, 150 Conn. 169 [187 A.2d 230]; vacated and remanded in *Traub* v. *Connecticut*, 374 U.S. 493 [83 S.Ct. 1899, 10 L.Ed.2d 1048]; again affirmed in *State* v. *Traub*, 151 Conn. 246 [196 A.2d 755]; certiorari denied 377 U.S. 960 [84 S.Ct. 1637, 12 L.Ed.2d 503].) It is conceivable that the entire problem has become academic by reason of *Miranda* v. *Arizona*, 384 U.S. 436 [86 S.Ct. 1602, 16 L.Ed.2d 694], decided June 13, 1966, since it is certainly arguable that if a defendant makes an incriminating statement after the police have complied with the mandate of that decision, the connection between the illegal arrest and the statement has become sufficiently ''attenuated as to dissipate the taint.''

les County Sheriff and which Steward apparently was required to sign when he visited Wheeler at the county jail on April 8, 1965; 4. the "blueprint" for the burglary previously referred to; and 5. a small piece of paper containing what appears to be Steward's signature and address.[8]

The expert then testified that in his opinion both the longhand and printed portions of all the documents were prepared by the same person.

At the end of the trial, counsel for defendant then moved to strike the entire testimony of Steward. At first this motion was granted *in toto*. Having obtained this ruling, which conceivably might have included the sketch drawn by Steward on the witness stand and the writing thereon which had been used for the purpose of authenticating the "blueprint," counsel for defendant persisted and made a further motion to exclude the sketch. This motion was resisted by the prosecutor. Then there followed many pages of argument. At one point the court expressed doubt whether any part of Steward's testimony should have been stricken, but there was never any formal change in the court's ruling. The court did however rule definitely that the sketch was admissible.

We see no error, at least none of which defendant can complain. We are, of course, only concerned with the sketch, not with the testimony, and the sketch is material only in that it was used as an exemplar by the expert.

Apart from the fact that the overwhelming weight of authority is to the effect that handwriting exemplars are not protected by the privilege against self-incrimination,[9] California courts have held in an unbroken line of decisions that only the holder of the privilege may base a claim of error on its violation. (*People* v. *Lewis,* 222 Cal.App.2d 136, 146 [35 Cal.Rptr. 1]; *People* v. *Hanson,* 197 Cal.App.2d 658, 663 [17 Cal.Rptr. 334]; *People* v. *Mann,* 148 Cal.App.2d 851, 852-853 [307 P.2d 684]; *People* v. *Judson,* 128 Cal.App. 768, 773 [18 P.2d 379]; *People* v. *Leavitt,* 127 Cal.App.394, 396 [15 P.2d 894]; *People*

[8]There is evidence in the record that items 2 and 3 were prepared by Steward. Item 1 was, of course, drawn by him on the stand. We have searched the record with a fine-tooth comb and are unable to find any testimony that item 5 was an admitted standard. However, defendant makes *no complaint on that score.*

[9]Both *Schmerber* v. *California,* 384 U.S. 577 [86 S.Ct. 1826, 16 L.Ed.2d 908], decided June 20, 1966 and *People* v. *Graves,* 64 Cal.2d 208 [49 Cal.Rptr. 386, 411 P.2d 114] contain strong dicta to that effect; see also *People* v. *Harper,* 115 Cal.App.2d 776, 779 [252 P.2d 950]; Maguire, Evidence of Guilt (1959) § 2.05; Annotation 171 A.L.R. 1144, 1177-1178, 1192-1196; 8 Wigmore, McNaughton Revision, § 2265.

v. *Gonzales*, 56 Cal.App. 330, 331 [204 P. 1088].) The rule will be statutory when the Evidence Code goes into effect January 1, 1967. (Evid. Code, § 918.)

The judgment is affirmed.

Shinn, P. J., and Ford, J., concurred.