[No. A021804. First Dist., Div. Five. June 14, 1989.]

THE PEOPLE, Plaintiff and Respondent, v.
JUAN VALLEJO CORONA, Defendant and Appellant.

[Opinion certified for partial publication.*]

---

* Pursuant to California Rules of Court, rules 976(b) and 976.1, this opinion is certified for publication with the exception of Parts II(B), II(C)(4)-(7) and II(E)-(H).

COUNSEL

Michael Mendelson, Margeret E. Murray, James T. Diamond, Jr., Mary Hughes and Arnelle & Hastie for Defendant and Appellant.

John K. Van de Kamp, Attorney General, Steve White, Chief Assistant Attorney General, John H. Sugiyama, Assistant Attorney General, Laurence K. Sullivan and Stan M. Helfman, Deputy Attorneys General, for Plaintiff and Respondent.

**OPINION**

**KING, J.—**

## I. INTRODUCTION

In this case we affirm a judgment of conviction on 25 counts of first degree murder and hold, among other things, that (1) systematic but non-purposeful denial of a fair cross-section of the community in the selection of a grand jury does not require reversal absent prejudice relating to the conviction, and (2) the consular privilege to withhold evidence in criminal proceedings is held and may be waived only by the consul's government, not the individual consul, but the defendant is not a holder of the privilege and thus on appeal is statutorily precluded from asserting error by the trial court in failing to assert the privilege on the government's behalf.

The facts of this case are fully recounted in *People* v. *Corona* (1978) 80 Cal.App.3d 684, 693-701 [145 Cal.Rptr. 894], and need not be repeated here except in summary. The victims were male migratory farmworkers who were killed during February-May 1971 and were buried on two

ranches in the Marysville-Yuba City area of Sutter County. Most were wounded in similar fashion, with chop or hacking wounds to the head and stab wounds in the upper left chest. They were also buried in a similar manner, with each victim lying on his back and his hands over his head, chest or stomach and his shirt or other clothes pulled over his head.

Juan Vallejo Corona was employed as a labor contractor for the two ranches where the victims were buried. He was connected to the crimes by overwhelming circumstantial evidence. As a labor contractor he had access to the area of the gravesites. Several eyewitnesses saw him in the area at crucial times, and some of the victims had last been seen entering his pickup truck or van. One grave contained two meat company sales slips bearing Corona's name; another grave contained various items belonging to Corona and two bank deposit slips bearing his name.

A search of Corona's office yielded two bloodstained knives and a blood-stained pistol (one of the victims had been shot in the head). A search of Corona's residence, car and van yielded a posthole digger in which human hairs were embedded, a bolo knife, many personal items containing blood-stains (including boots, a jacket, a belt, floor mats and throw rugs), and a ledger containing a list of names and dates in Corona's handwriting includ-ing the names of seven identified victims. Bloodstains appeared all over the inside and outside of the van as well as on the latch of the car trunk. One of Corona's neighbors had frequently observed him hosing out the inside of his vehicles without washing the outside. A laboratory examination of the various bloodstains revealed human blood of all four blood types. (80 Cal.App.3d at pp. 693-701.)

Corona was tried, convicted and sentenced in Solano County in 1972-1973. Division Two of the First Appellate District reversed the judgment in 1978, on two grounds. First, Corona's trial counsel provided inadequate legal representation in that he failed to present any of the defenses he promised in his opening statement and failed to present any defense based on mental incompetence and legal insanity (80 Cal.App.3d at pp. 705-719), which the appellate court characterized as "not only a 'crucial,' but the 'sole' defense in the case." (*Id.* at p. 719.) Second, trial counsel's agreement to accept a grant of exclusive literary and dramatic property rights to Corona's life story in return for legal services created a prejudicial conflict of interest. (*Id.* at pp. 719-727.)

The retrial occurred in Alameda County in 1982. The prosecution's case was substantially similar to that presented in the first trial, with two notable additions: The prosecution presented evidence of Corona's 1978 admission to a Mexican consul that he had committed the crimes but was a "sick

man," and his 1974 admission to another prisoner that he had committed the crimes but "it was my brother's idea."

Corona was represented on retrial by a skilled and tenacious team of defense lawyers. Counsel evidently disagreed with the appellate court's characterization of mental incompetence and legal insanity as the "sole" defense in the case, and presented the theory that the murders had been committed by Corona's half-brother, Natividad Corona, who had owned a local bar-cafe and died in 1973 in Mexico.

Once again the jury convicted Corona of 25 counts of first degree murder. The court sentenced him to 25 concurrent prison terms of 25 years to life.

## II. DISCUSSION

### A. *The Composition of the Grand Jury.*

■ Shortly after reversal of the first judgment, Corona moved unsuccessfully to quash his grand jury indictment on the ground the grand jury did not represent a fair cross-section of Sutter County due to underrepresentation of Mexican-Americans. On appeal he asserts three reasons why the trial court erred: (1) the superior court judge who had been responsible for selecting potential grand jurors from 1962 to 1971 had failed to develop affirmative procedures to achieve a fair cross-section (see *People* v. *Superior Court (Dean)* (1974) 38 Cal.App.3d 966, 972 [113 Cal.Rptr. 732]), (2) the repeated service of certain grand jurors demonstrated that the grand juries had not been selected at random, and (3) the trial court found no underrepresentation based on improper consideration of the estimated number of Mexican-Americans who had been "eligible" for grand jury service by virtue of sufficient proficiency in the English language, rather than on the general population of Mexican-Americans in Sutter County. (See *Castaneda* v. *Partida* (1977) 430 U.S. 482 [51 L.Ed.2d 498, 97 S.Ct. 1272].)

It is crucially important to clarify the nature of Corona's challenge to the grand jury. ■ There are two types of racially based challenges to the composition of petit and grand juries: the claim of intentional discrimination and the claim of an absence of a fair cross-section of the community. Intentional discrimination in the composition of petit and grand juries violates the constitutional right to equal protection. (*Batson* v. *Kentucky* (1986) 476 U.S. 79, 84 [90 L.Ed.2d 69, 79, 106 S.Ct. 1712] [petit juries]; *Vasquez* v. *Hillery* (1986) 474 U.S. 254, 261-262 [88 L.Ed.2d 598, 607-608, 106 S.Ct. 617] [grand juries].) The absence of a fair cross-section on a petit jury venire due to systematic but nonpurposeful exclusion of a distinctive group in the community violates the Sixth Amendment guaranty of trial by an impartial

jury. (*Duren* v. *Missouri* (1979) 439 U.S. 357, 358-359 [58 L.Ed.2d 579, 583-584, 99 S.Ct. 664].) The absence of a fair cross-section of the community in the selection of a grand jury is generally said to violate due process. (See *Hobby* v. *United States* (1984) 468 U.S. 339, 346 [82 L.Ed.2d 260, 267, 104 S.Ct. 3093] [attributing fair cross-section requirement to "representational due process values"]; 2 LaFave & Israel, Criminal Procedure (1984) § 15.3(c), p. 294; *id.* (1989 pocket supp.) pp. 81-82.)

■ Corona does not claim intentional discrimination. Defense counsel asserted below that "nobody is accusing this gentleman [the judge responsible for selecting potential grand jurors] of intentionally discriminating against anybody and I want that clear for the record." Counsel later mentioned that "incidently I don't waive" the claim of intentional discrimination, but this assertion was directly contrary to counsel's earlier concession and was not pursued further. The trial court concluded there had been "no intentional discrimination in the selection of grand jurors," and Corona does not challenge that conclusion on appeal. This is a fair cross-section claim, not an intentional discrimination claim.[1]

■ The distinction is not particularly important with regard to methods of proof: the prima facie tests for the two claims are nearly identical, although the claims differ in the way the prima facie case is rebutted. (See *Davis* v. *Zant* (11th Cir. 1983) 721 F.2d 1478, 1482 fn. 6.) But the distinction is crucial for purposes of harmless error analysis. We shall proceed directly to a discussion of harmless error because, as will be seen, the applicable harmless error standard makes it entirely unnecessary to decide the merits of the fair cross-section claim.

■ The general rule in California is that a conviction will not be reversed due to an irregularity in grand jury proceedings absent a showing that the irregularity deprived the defendant of a fair trial or otherwise resulted in actual prejudice relating to the conviction. (*People* v. *Towler* (1982) 31 Cal.3d 105, 123 [181 Cal.Rptr. 391, 641 P.2d 1253]; *People* v. *Laney* (1981) 115 Cal.App.3d 508, 513 [171 Cal.Rptr. 493]; cf. *People* v. *Pompa-Ortiz* (1980) 27 Cal.3d 519, 529 [165 Cal.Rptr. 851, 612 P.2d 941] [irregularity in preliminary examination procedure].) Absent a possibility of prejudice it is unnecessary to decide the merits of a claim of irregularity. (See *People* v. *Towler, supra*; *People* v. *Laney, supra*.) Any right to relief without a showing of prejudice is limited to a pretrial challenge by extraordinary writ. (Cf. *People* v. *Pompa-Ortiz, supra,* 27 Cal.3d at p. 529.)

[1] In contrast, the primary case upon which Corona relies, *Castaneda* v. *Partida, supra,* 430 U.S. 482, was an intentional discrimination case. (*Id.* at pp. 497-498, 501 [51 L.Ed.2d at pp. 512-513, 514].)

■ The United States Supreme Court has declared, however, that intentional discrimination in the selection of grand jurors is reversible per se. (*Vasquez* v. *Hillery, supra,* 474 U.S. at pp. 260-264 [88 L.Ed.2d at pp. 607-609].) The issue presented here is whether the rule of automatic reversal for intentional discrimination extends to the absence of a fair cross-section.

The answer is evident in *United States* v. *Mechanik* (1986) 475 U.S. 66, 70-71, footnote 1 [89 L.Ed.2d 50, 56, 106 S.Ct. 938], which involved the unauthorized simultaneous presence of two witnesses at a grand jury proceeding. In *Mechanik* the Supreme Court limited the rule of automatic reversal to the "special problem of racial discrimination" (*ibid.*) confronted in *Vasquez*. According to *Mechanik,* in *Vasquez* the court "reasoned that racial discrimination in the selection of grand jurors is so pernicious, and other remedies so impractical, that the remedy of automatic reversal was necessary as a prophylactic means of deterring grand jury discrimination in the future, [citation], and that one could presume that a discriminatorily selected grand jury would treat defendants of excluded races unfairly." (*Ibid.*) The *Mechanik* opinion concluded, "We think that these considerations have little force outside the context of racial discrimination in the composition of the grand jury." (*Ibid.*)

*Mechanik* removes the fair cross-section cases from the scope of the *Vasquez* rule of automatic reversal. *Mechanik*'s limitation of the *Vasquez* rule to the "context of racial discrimination," in conjunction with *Mechanik*'s discussion of the special considerations in *Vasquez,* indicates the Supreme Court was referring to the type of discrimination involved in *Vasquez,* that is, *intentional* discrimination. The rule of automatic reversal declared in *Vasquez* was specifically founded on the severity of the "grave constitutional trespass" resulting from "intentional discrimination." (*Vasquez* v. *Hillery, supra,* 474 U.S. at p. 262 [88 L.Ed.2d at p. 608].) Indeed, in *Vasquez* the Supreme Court was motivated by the need to vindicate the right to equal protection (*ibid.*), while a fair cross-section violation implicates an entirely different right, the right to due process.

A recent pronouncement by the California Supreme Court in a related context interprets the *Vasquez* rule of automatic reversal as applying only to intentional discrimination and not to fair cross-section claims. In *People* v. *Myers* (1987) 43 Cal.3d 250, 263-270 [233 Cal.Rptr. 264, 729 P.2d 698], the court held that the rule of *People* v. *Harris* (1984) 36 Cal.3d 36 [201 Cal.Rptr. 782, 679 P.2d 433] precluding use of voter registration lists as the single source for petit jury panels does not apply retroactively, reasoning that a *Harris* violation does not necessarily mean a trial was unfair. The court relied on *Daniel* v. *Louisiana* (1975) 420 U.S. 31, 32-33 [42 L.Ed.2d 790, 792-793, 95 S.Ct. 704], which similarly held that the petit jury venire

fair cross-section rule declared in *Taylor* v. *Louisiana* (1975) 419 U.S. 522 [42 L.Ed.2d 690, 95 S.Ct. 692] did not apply retroactively because among other things a violation of the rule does not necessarily result in an unfair trial. (See also *Teague* v. *Lane* (1989) 489 U.S. 288, 316 [103 L.Ed.2d 334, 359, 109 S.Ct. 1060] [any new rule requiring fair cross-section on petit jury itself would not be a "bedrock procedural element" that would be applied retroactively].) The *Myers* court acknowledged the *Vasquez* rule of automatic reversal but distinguished *Harris* and *Taylor* on the ground that neither "involved a claim that the state had engaged in intentional invidious discrimination in the selection of juries in violation of equal protection principles." (*People* v. *Myers, supra,* 43 Cal.3d at p. 267, fn. 6.) If, as in *Myers* and *Daniel,* prejudice from a petit jury venire fair cross-section violation could not be conclusively presumed for purposes of retroactivity, prejudice should not be conclusively presumed in the present context.

 Consequently, the rule of automatic reversal does not apply here. We are bound by the general rule prohibiting reversal absent actual prejudice relating to the conviction. Corona asserts no such prejudice, and none is apparent from the record. Corona was not even tried in the same county from which the indictment arose.

It is therefore completely unnecessary to address or decide the merits of Corona's fair cross-section claim. Even assuming the grand jury was not drawn from a fair cross-section of the community, any such error was harmless and cannot lead to reversal.[2]

Discussion of the merits of the fair cross-section claim is not only unnecessary, it is pointless. Grand jury selection procedures in Sutter County in 1971 are ancient history. They preceded the major pronouncements by the United States Supreme Court on the fair cross-section requirement (*Duren* v. *Missouri, supra,* 439 U.S. 357; *Taylor* v. *Louisiana, supra,* 419 U.S. 522) as well as the assertion in *People* v. *Superior Court (Dean), supra,* 38 Cal.App.3d at page 972, of the "affirmative duty to develop and pursue procedures aimed at achieving a fair cross-section of the community." There is now plenty of authority to guide Sutter County in the selection of grand jurors. The county would not significantly benefit from a gratuitous pronouncement by us as to where it went wrong in 1971.

---

[2] The decision in *People* v. *Pompa-Ortiz, supra,* 27 Cal.3d at page 529, indicates that Corona should have challenged the trial court's ruling by extraordinary writ instead of appeal, but in fairness to defense counsel we note that *Pompa-Ortiz* was not decided until a year after the trial court denied Corona's motion to quash the indictment.

B. *Misstatements and Omissions in the Search Warrant Affidavit.** 

. . . . . . . . . . . . . . . . . . . . on

C. *Corona's Conversation With the Mexican Consul.*

In April 1978, Jesus Rodriguez Navarro, the Mexican consul in San Jose at that time, met with Corona to discuss Corona's eligibility for a prisoner exchange program between Mexico and the United States. During the meeting Rodriguez asked Corona whether it was true that he had committed the crimes of which he was accused. Corona replied, "Yes, I did it and I'm a sick man and a sick man cannot be judged as the rest of them." Corona asserts multiple theories of error in the court's admission of Rodriguez's testimony concerning this conversation.

1. *The Vienna Convention on Consular Relations.*

 Corona's strongest argument, at least in the abstract, is that the conversation with Rodriguez was privileged under the Vienna Convention on Consular Relations. The convention provides the following privilege: "Members of a consular post are under no obligation to give evidence concerning matters connected with the exercise of their functions or to produce official correspondence and documents relating thereto." (Vienna Convention on Consular Relations, Apr. 24, 1963, art. 44, subd. (3), 21 U.S.T. 77, 105.)[3] The Convention further provides in pertinent part that "[t]he sending State may waive" this privilege (*id.* at art. 45, subd. (1), 21 U.S.T. at p. 106), and "[t]he waiver shall in all cases be express . . . and shall be communicated to the receiving State in writing" (*id.* at art. 45, subd. (2), 21 U.S.T. at p. 106).

The Mexican government did not submit a written waiver of the consular privilege, nor did the government make any apparent effort to prevent Rodriguez from testifying. H. Ted Hansen, the District Attorney of Sutter County at the time of retrial, testified that a Mexican government official had told him that the government would not issue a written waiver but the government's unofficial position was that it had no objection to Rodriguez's testimony. An attorney purporting to represent the Mexican government on

---

* See footnote, *ante,* page 529.

[3] A treaty between the United States and Mexico similarly provides, "A consular officer shall not be required to testify in criminal, contentions-administrative, labor or civil cases, regarding acts performed by him in his official capacity." (Convention Between the United States of America and Mexico Respecting Consular Officers, Aug. 12, 1942, art. II, § 4, 57 Stat. 800, 804, T.S. 985.)

a "preliminary" basis appeared in court informally and advised the judge of the consular privilege but never purported to assert the privilege on Mexico's behalf. The court ruled that the Vienna Convention's requirement of a written waiver applied only to compelled testimony and did not apply here because Rodriguez was testifying voluntarily.

Corona correctly contends that the consular privilege could only be waived by the Mexican government, in writing, and that Rodriguez did not have any independent authority to waive the privilege. This is because the Mexican government, not Rodriguez, was the holder of the privilege. The International Law Commission, which drafted the Vienna Convention on Consular Relations, stated quite clearly in a report to the United Nations General Assembly that the capacity to waive the privileges and immunities established by the convention "is vested exclusively in the sending State, for that State holds the rights granted under these articles. The consular official himself has not this capacity." (2 Yearbook of the Internat. Law Com. (1961) Rep. of the Com. to the Gen. Assem., p. 118; see *Flynn* v. *Shultz* (7th Cir. 1984) 748 F.2d 1186, 1188 [asserting that "only the sending state" may waive the privilege]; cf. *Börs* v. *Preston* (1884) 111 U.S. 252, 256 [28 L.Ed. 419, 420, 4 S.Ct. 407] [consul's exemption from lawsuit was held by state, not by individual consul].) The United States delegation to the convention reported that, "To many delegations, the matter of testifying or declining to testify was considered too important to be left to the decision of local authorities or the individual consular officers based on their own inclinations and convenience. Rather, they believed it to be a matter for agreement between the States concerned." (Message from the President of the United States Transmitting the Vienna Convention on Consular Relations, Report of the United States Delegation, Sen. Rep. No. Executive E, 91st Cong., 1st Sess. p. 65 (1969) (hereafter Report of the United States Delegation).) Indeed, to permit an individual consular officer to waive the privilege independent of the state would impair the state's ability to follow a consistent long-term policy with regard to assertion of the privilege.

Because Rodriguez had no authority to waive the consular privilege, the trial court should have excluded his testimony for want of a written waiver by the Mexican government. Under Evidence Code section 916, subdivision (a), courts must on their own motion or the motion of any party exclude privileged information if the person from whom the information is sought is not authorized to claim the privilege and there is no party to the proceeding who is so authorized.

Section 916 specifically refers to information that is privileged "under this division" of the Evidence Code (i.e., the division on privileges), but this does not exclude the consular privilege. The Assembly Judiciary Committee

comment on section 916 states that the statute "may be declarative of the existing law" (Assem. Judiciary Com. com., 29B West's Ann. Evid. Code (1966 ed.) § 916, p. 502), and the decision cited by the comment, *People* v. *Atkinson* (1870) 40 Cal. 284, 285, did not suggest that the trial court's duty was limited to the privileges now specified in the Evidence Code. The inherent duty of a court to assert a privilege on behalf of an absent holder is rooted in the common law of California (*People* v. *Atkinson, supra*; *Stearns* v. *Los Angeles City School Dist.* (1966) 244 Cal.App.2d 696, 723 [53 Cal.Rptr. 482, 21 A.L.R.3d 164] [citing Evidence Code but preceding its operative date]; *Newell* v. *Newell* (1956) 146 Cal.App.2d 166, 176-178 [303 P.2d 839]) as well as other jurisdictions (*Tucson Medical Center Incorporated* v. *Rowles* (1974) 21 Ariz.App. 424 [520 P.2d 518, 524]; *Stauffer* v. *Karabin* (1971) 30 Colo.App. 357 [492 P.2d 862, 864-865]; see Model Code of Evid., § 105, subd. (e)). ■ The rationale for the duty, the need "to protect the holder of a privilege when he is not available to protect his own interest" (Assem. Judiciary Committee com., 29B West's Ann. Evid. Code (1966 ed.) § 916, p. 502), applies equally to the consular privilege. And even if section 916 is construed as being limited to privileges encompassed by the Evidence Code, the treaty-based consular privilege can be so characterized, since the Evidence Code provides that there are no privileges "[e]xcept as provided by statute" (Evid. Code, § 911) and the word "statute" includes treaties (Evid. Code, § 230).

■ The trial court therefore erred in failing to assert the consular privilege on behalf of Mexico and exclude Rodriguez's testimony. But the error is only a matter of abstract interest. Corona was not a holder of the privilege and therefore is statutorily precluded from asserting the error on appeal. "A party may predicate error on a ruling disallowing a claim of privilege only if he is the holder of the privilege . . . ." (Evid. Code, § 918; see also Assem. Judiciary Com. com., 29B West's Ann. Evid. Code (1966 ed.) § 916, p. 502.) Thus, for example, only the holder of the privilege against self-incrimination may base a claim of error on its violation. (*People* v. *Wheeler* (1966) 243 Cal.App.2d 340, 348 [52 Cal.Rptr. 508]; *People* v. *Gonzales* (1922) 56 Cal.App. 330, 331 [204 P. 1088].) The present error, quite simply, cannot be asserted by Corona as a basis for reversal. (See *Banco de Espana* v. *Federal Reserve Bank* (2d Cir. 1940) 114 F.2d 438, 445 [Spanish bank could not assert ambassador's immunity from testifying].)[4]

This statutory rule of noncognizability is not unjust as applied to Corona. ■ The purpose of the consular privilege "is not to benefit

---

[4]On May 19, 1982, Division One of this court summarily denied Corona's writ petition challenging the admission of Rodriguez's testimony. Division One may have concluded that Corona was precluded from asserting the error on writ review as well as on appeal; one of the People's arguments in opposition to the petition was that Corona lacked "standing" to claim error.

individuals but to ensure the efficient performance of functions by consular posts on behalf of their respective States." (Vienna Convention on Consular Relations, *supra,* preamble, 21 U.S.T. at p. 79.) Corona was not an intended beneficiary of the privilege and thus cannot reasonably complain that he was deprived of a windfall benefit to which he had absolutely no independent right.

Nor does the statutory rule interfere with the performance of consular functions by inhibiting foreign prisoners in their conversations with consular officers. As the United States delegation to the Vienna Convention noted, "In view of the principle that privileges and immunities are granted for governmental reasons rather than for the benefit of individuals, waivers of immunity are not uncommon. Examples of situations in which waivers of immunity might be sought are those in which the testimony of a consular officer is required . . . as a disinterested witness in . . . criminal prosecutions . . . ." (Report of the United States Delegation, *supra,* p. 65.) Thus, even if prisoners could complain of a court's erroneous failure to enforce the privilege, they would still have no assurance of confidentiality, since the state is the sole holder of the privilege and might very well waive it over a prisoner's objection.

### 2. *The prisoner exchange treaty.*

 Corona next contends his conversation with Rodriguez was privileged under the treaty establishing the prisoner exchange program between Mexico and the United States. (Treaty Between the United States of America and the United Mexican States on the Execution of Penal Sentences, Nov. 25, 1976, 28 U.S.T. 7399.) He relies solely on the treaty's general provision requiring consideration of "all factors bearing upon the probability that the transfer will contribute to the social rehabilitation of the offender, including the nature and severity of his offense and his previous criminal record, if any, his medical condition, the strength of his connections by residence, presence in the territory, family relations and otherwise to the social life of the Transferring State and the Receiving State." (*Id.* at art. IV, subd. (4), 28 U.S.T. at p. 7404.) Corona argues that consular interviews must be privileged in order to implement these criteria. The treaty, however, does not provide for any such consular privilege, either expressly or implicitly. While a privilege might indeed encourage prisoners to provide information bearing on the criteria pertinent to a transfer, the treaty simply provides no such privilege. Absent some indication that the treaty was intended to establish the privilege, none can be inferred.

### 3. *Mexican law and principles of comity.*

Corona also contends Rodriguez's testimony should have been excluded under Mexican law and principles of comity among nations. (See *Hilton* v.

*Guyot* (1895) 159 U.S. 113, 162-163 [40 L.Ed. 95, 108, 16 S.Ct. 139].) He relies on chapter VII, article 45, of the Organic Law of the Mexican Foreign Service. That provision imposes on foreign service officers a duty of confidentiality, the violation of which is a crime, regarding matters they learn about in their official capacities. This duty survives after they leave the foreign service as to matters that could damage the national interest.[5]

Rodriguez was no longer a foreign service officer when he testified. Thus, according to the Organic Law of the Mexican Foreign Service, his duty of confidentiality was limited to matters that could damage the national interest. Corona did not demonstrate below, and does not assert on appeal, that Rodriguez's testimony implicated any such matters. Rodriguez expressly testified that Mexico's national interest was *not* at stake, and defense counsel presented no contrary evidence. Consequently, Corona has failed to demonstrate any violation of Mexican law, and no issue of comity is presented.

Additionally, even assuming Rodriguez's testimony was privileged under the Organic Law of the Mexican Foreign Service, Corona has not demonstrated that he was a holder of this privilege and thus entitled to assert error on appeal. (Evid. Code, § 918.)

4.-7.*

D. *Use of Rodriguez's Consular Oath of Confidentiality in Cross-examination.*

 When Rodriguez left his consular office he signed an oath that he would not make public anything he learned in the course of his consular responsibilities without the written permission of the Mexican government. Defense counsel sought to use this document in cross-examining Rodriguez. The court ruled that counsel could ask Rodriguez if he signed the oath, but because the document was privileged counsel could not show it to Rodriguez and ask him about its contents absent the consent of the Mexican government.

Defense counsel then sought to demonstrate that Rodriguez had violated the oath by testifying at trial. Rodriguez initially claimed the oath was

---

[5] This provision reads as follows in the original Spanish: "Los miembros del Servicio Exterior deberán guardar discreción absoluta acerca de los asuntos que conozcan con motivo de sus desempeño oficial. Esta obligación subsistirá aún después de abandonar el Servicio Exterior cuando se trate de asuntos cuya divulgación pudiera causar perjuicio a los intereses nacionales."

* See footnote, *ante*, page 529.

limited to matters affecting the national security, but then said the oath contained no such limitation. In subsequent testimony Rodriguez again claimed the national security limitation. Defense counsel attempted to elicit an admission that this limitation appeared only in the Organic Law of the Mexican Foreign Service, and not in the oath. After much evident evasion of counsel's questions, during which Rodriguez repeatedly referred to the contents of the Organic Law of the Mexican Foreign Service rather than the contents of the oath itself and claimed that the "oath is based on the organic law," Rodriguez said he did not remember whether the words "national security" appeared in the oath.

The trial court's ruling precluded defense counsel from using the actual document to show that it did not contain the national security limitation. Corona asserts three theories of error.

1. *The Vienna Convention on Consular Relations.*

Corona first contends the document was not protected by any privilege. This argument is, of course, totally inconsistent with his claim that the conversation with Rodriguez was privileged under the Vienna Convention on Consular Relations. In fact the consular officials' privilege encompassed the document as well as the conversation, since the privilege extends not only to the giving of "evidence concerning matters connected with the exercise of their functions" but also to the production of "official correspondence and documents relating thereto." (Vienna Convention on Consular Relations, Apr. 24, 1963, art. 44, subd. (3), 21 U.S.T. 77, 105; see *ante,* p. 538.) The document privilege is a logical corollary of article 33 of the convention, which states, "The consular archives and documents shall be inviolable at all times and wherever they may be." (Vienna Convention on Consular Relations, *supra,* art. 33, 21 U.S.T. at p. 98; see Report of the United States Delegation, *supra,* p. 65.)

Corona correctly points out that it was inconsistent for the trial court to invoke the consular privilege only as to the document and not as to the conversation.[6] This does not, however, alter the fact that the court ruled properly with regard to the application of the privilege to the document, and as previously explained Corona is statutorily precluded from asserting the error as to the conversation. (See *ante,* p. 540.)

---

[6] The evident reason for the inconsistency was the court's erroneous conclusion that Rodriguez personally could waive the privilege, coupled with the fact that Rodriguez testified voluntarily as to the conversation but claimed the document was privileged.

2. *Assertion of the privilege on behalf of the Mexican government.*

When the court ruled that the document was privileged, defense counsel objected that the Mexican government had not claimed the privilege and the court had no standing to do so. The court responded that it was obligated to assert the privilege on behalf of Mexico. On appeal Corona repeats his claim that the court lacked authority to assert the privilege, claiming that the Mexican government had the sole authority to do so and never did.[7]

As previously explained, however, trial courts are required by Evidence Code section 916, subdivision (a), as well as by the common law, to exclude privileged information on their own motion when the person from whom the information is sought is not authorized to claim the privilege and there is no party to the proceeding who is so authorized. (See *ante,* pp. 539-540.) Because the Mexican government was the sole holder of the consular privilege (see *ante,* p. 539) and was not a party to the proceeding, the trial court was required to assert the privilege on Mexico's behalf.

Corona argues that the Mexican government actually consented to the admission of the oath into evidence, so that the trial court was precluded from asserting the privilege. (Evid. Code, § 916, subd. (b)(1) [exclusion prohibited if judge "is otherwise instructed by a person authorized to permit disclosure"].) But there was no such consent; rather, the Mexican government simply omitted to make an unequivocal assertion of the privilege. (See *ante,* fn. 7.) Such inaction is hardly the equivalent of an instruction to permit disclosure of privileged evidence.

3. *The Sixth Amendment right of confrontation.*

Finally, Corona contends that any privilege should have yielded to his Sixth Amendment right to confront and cross-examine Rodriguez. ██ It is true that a rule of evidence may not be enforced if it would infringe the right to a fair trial. (*Hammarley* v. *Superior Court* (1979) 89 Cal.App.3d 388, 401-402 [153 Cal.Rptr. 608]; see, e.g., *Chambers* v. *Mississippi* (1973) 410 U.S. 284, 302[35 L.Ed.2d 297, 312-313, 93 S.Ct. 1038].) But the threat of a constitutional infringement depends upon the circumstances of each case (*Hammarley* v. *Superior Court, supra,* 89 Cal.App.3d at pp. 401-402), and there was no such threat here.

---

[7]The Attorney General claims that in earlier proceedings the attorney who appeared informally on Mexico's behalf asserted the privilege on instructions from the Mexican government. In fact, counsel made only the arguably more limited request that the document "be covered by seal at all times" and returned after those proceedings. The record is at best equivocal as to whether this was an implicit assertion of the consular privilege.

The court in *Hammarley,* for example, held that the newsperson's privilege to refuse to disclose a news source (Evid. Code, § 1070) could not be applied in that case because any prospective burden on news gathering was highly speculative and uncertain, so that application of the privilege would not have furthered its objectives, whereas there was a demonstrated need for the evidence in order to assure the right to a fair trial. (*Hammarley* v. *Superior Court, supra,* 89 Cal.App.3d at pp. 402-403.) Here, in contrast, nonconsensual use of the privileged document would have struck at the heart of the consular privileges and immunities established by the Vienna Convention, while any intrusion upon Corona's right of confrontation was minimal. Rodriguez conceded at one point that his oath did not contain the national security limitation, and when he later claimed a lack of recollection his evasion was quite evident. In light of the concession and subsequent evasion, it must have been obvious to the jury that the oath did not include the words "national security." Indeed, the trial judge commented that defense counsel was "beating this issue to death." There was little need for access to the oath itself for defense counsel to make the point.[8]

Moreover, in order for Corona to avoid the privilege there must have been a reasonable probability that the use of the document might have resulted in his exoneration. (89 Cal.App.3d at p. 399.) Even assuming the use of the document would have significantly helped to show that Rodriguez had violated his oath by testifying, it is a mighty quantum leap, quite unwarranted, to conclude that this might have resulted in Corona's exoneration.

Under the circumstances of this case, therefore, any Sixth Amendment intrusion was so minimal as not to preclude application of the consular privilege.

E.-H.*

. . . . . . . . . . . . . . . . . . . .

### III. CONCLUSION

Justice in this extraordinary case has taken a long time to achieve at considerable expense. It has been almost 20 years since the murders. During

---

[8] The record does not include a transcript of the closing arguments and thus does not reveal how trial counsel argued this point—e.g., whether defense counsel cited Rodriguez's initial concession, or whether the prosecutor denied that Rodriguez had violated his oath by testifying.

* See footnote, *ante,* page 529.

that time millions of taxpayers' dollars were expended to assure that Corona was afforded the rights to which all criminal defendants are entitled under our system of justice, including adequate legal representation. Indeed, our review of the record in Corona's retrial convinces us that he received a very high quality of legal representation from his court appointed counsel.

Perfection can rarely be achieved in such lengthy criminal proceedings, and was not achieved here. ■ However, "[a] defendant is entitled to a fair trial but not a perfect one." (*Lutwak* v. *United States* (1953) 344 U.S. 604, 619 [97 L.Ed. 593, 605, 73 S.Ct. 481].) We are fully satisfied that Corona's second trial was fair and that, ultimately, justice has been accomplished for both Corona and the people of this state.

The judgment is affirmed.

Low, P. J., and Haning, J., concurred.

Appellant's petition for review by the Supreme Court was denied September 7, 1989.