Filed 9/25/13  P. v. Scott CA2/1

## NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SECOND APPELLATE DISTRICT

DIVISION ONE

| | |
|---|---|
| THE PEOPLE, | B238322 |
| Plaintiff and Respondent, | (Los Angeles County Super. Ct. No. NA085350) |
| v. | |
| BRAD SCOTT, | |
| Defendant and Appellant. | |

APPEAL from a judgment of the Superior Court of Los Angeles County.  Joan Comparet-Cassani, Judge.  Affirmed in part, reversed in part.

Dennis A. Fischer for Defendant and Appellant

Kamala D. Harris, Attorney General, Dane R. Gillette, Chief Assistant Attorney General, Lance E. Winters, Assistant Attorney General, Zee Rodriguez and J. Michael Lehmann, Deputy Attorneys General, for Plaintiff and Respondent.

_____

Brad Scott appeals from the judgment following a jury trial in which he was convicted of felony boating under the influence of alcohol in violation of Harbors and Navigation Code section 655, subdivision (f). The principal issues at trial were whether Scott was piloting the boat when it crashed severely injuring his passenger and, if so, whether he was piloting the boat under the influence of alcohol. On appeal, Scott contends the trial court committed reversible errors in certain of its evidentiary rulings, jury instructions and verdict forms. He also contends the court committed reversible sentencing errors.

We conclude that even if the court committed the alleged guilt-phase errors, they do not singly or in combination require reversal of Scott's conviction. We agree with the parties that the court erred in its belief that it lacked discretion to strike the great bodily injury enhancements or their punishments. Therefore, we affirm the conviction, vacate the sentence and remand the cause for resentencing.

## FACTS AND PROCEEDINGS BELOW

At approximately 1:45 in the morning, a dinghy traveling between 10 and 20 knots[1] in a 5 knot speed zone smashed into the side of a well-lit, 43-foot white sailboat anchored in a crowded harbor at Catalina Island.

Two men were in the dinghy: Brad Scott, its owner, and Rel Vrooman, his friend. Both men were unconscious when the sailboat's owners came to their aid. Vrooman suffered a head injury requiring surgery and lay in a medically-induced coma for a month and a half. Vrooman also broke his collarbone, scapula, left arm and elbow and all of his ribs. His spleen had to be removed and he lost most of his eyesight. Scott suffered only minor injuries.

---

[1] A knot equals 1.15077945 miles per hour. At the speed the dinghy was traveling, knots and miles-per-hour are roughly the same.

2

## A. The Prosecution's Case.

The prosecution charged Scott with violating Harbors and Navigation Code section 655, subdivision (f) [2] on the theory that Scott was piloting the boat at the time of the accident, that he was intoxicated, that the boat was exceeding the harbor speed limit and that his conduct was the proximate cause of Vrooman's injuries. In support of this theory, the prosecution introduced the following evidence.

### 1. Evidence that Scott was piloting the boat.

Marissa Brown, one of the owners of the sailboat, was the first person to reach Vrooman and Scott. She tied their dinghy to her boat, climbed into the dinghy and shut off the motor. She testified that she believed Scott was sitting on the floor of the dinghy on the left side in front of the rear seat and that Vrooman was lying on his back on the dinghy's right pontoon. She conceded, however, that "I may have my directions screwed up by now."

Marissa's husband, David Brown, contradicted Marissa's testimony as to the positions of Scott and Vrooman. He testified Scott was seated at the center console bent at the waist and neck. Vrooman was "laid out" on the left pontoon of the dinghy.

Steve Sturdivant, a paramedic, supported David Brown's testimony. Sturdivant testified that when he arrived at the scene Vrooman was lying on the "left bow portion of the boat." Scott was slumped over on the floor of the dinghy. "He was definitely not in the driver's seat" when Sturdivant arrived at the scene. Sturdivant also testified the speed limit in the harbor where the accident occurred was 5 knots.

A helicopter transported both men to Harbor UCLA Hospital.

---

[2]     Harbors and Navigation Code section 655, subdivision (f) states in relevant part that it is unlawful to "operate any vessel . . . while under the influence of an alcoholic beverage . . . and while so operating, do any act forbidden by law, or neglect any duty imposed by law in the use of the vessel . . . which act or neglect proximately causes bodily injury to [another]."

Vrooman's son, Tyler, testified that he went to the hospital soon after his father and Scott arrived there. He saw Scott on a gurney and asked him what happened. Scott replied: "We were going too fast and I hit something." Tyler then asked Scott: "So you hit it, it did not hit you?" Scott replied, "Yes." On cross-examination Tyler reiterated his testimony that Scott said "I hit it," not "we hit it." He said that the latter statement attributed to him in a sheriff's report was misreported. Tyler also testified that Scott told him that when his father wakes up Tyler should tell him that "he shouldn't say who was driving the boat . . . or to say that he doesn't remember."

Vrooman's daughter, Rachel, testified that she was visiting her father in the hospital a few days after the accident when she was approached by a woman who said that her name was Jill and that she was Scott's girlfriend. Jill told Rachel that she was sorry about what happened to Rachel's father. Then Jill said: "It is important that when your father wakes up he says that he doesn't remember who was driving the boat to the police."

Rachel further testified that a few days after meeting Jill, she received a telephone call from Scott. After expressing his sorrow about what happened to Rachel's father, Scott told her: "It is important that if the police call you or contact you to say that your dad says that he doesn't remember who was driving the boat."

Vrooman's friend, Yvette Harbor, told the jury that on one of her visits to Vrooman in the hospital Vrooman told her that Scott had been to see him and told him that if anyone asked about the accident to say he can't remember. Harbor testified that Vrooman told her that Vrooman "wasn't driving the boat."

When Vrooman took the stand he testified on direct examination that he believed he told Harbor he was not driving the boat. He also testified that he had no present memory of the accident.

The prosecution's accident reconstruction expert, Dr. Marc Firestone, testified that Vrooman could not have been piloting the dinghy at the time of the accident. He based his opinion on the severity and location of Vrooman's injuries—severe trauma to the left

4

side of his chest, his spleen and fractures primarily on the left side of his skull—which, he believed, could only have occurred by Vrooman's direct contact with a hard surface, such as the side of the sailboat, at a high rate of speed. If Vrooman had been seated at the dinghy's control console when the dinghy hit the side of the sailboat, his body would have struck the steering wheel and rebounded to the aft end of the boat. There was no way Vrooman could have wound up near the bow of the boat where he was found. Firestone further testified that assuming Vrooman had been standing at the boat's console, he still could not have suffered the injuries to the left side of his head and chest. He would have flipped over the console and landed in the well of the boat between the middle and front seats. In contrast, Firestone testified, the location of Scott's body immediately after the accident and his relatively minor injuries were consistent with his being seated at the control console when the collision occurred.

### 2. Evidence that Scott was under the influence of alcohol when the crash occurred.

Marissa Brown, one of the sailboat's owners who rescued Scott and Vrooman, testified that she could smell alcohol on their breath as soon as she got within a few feet of them.

The hospital records showed that Scott's whole blood/alcohol level at approximately 5:00 a.m., a little over three hours after the collision, was between .15 and .23.

A trauma surgeon at the hospital testified that Scott's blood/alcohol level was a concern to the trauma team and they decided to keep Scott at the hospital under observation until he "sober[ed] up."

An expert on the effects of alcohol on human mental capacity, Dr. Henry Greenberg, testified that piloting a boat is a "divided attention task." Most people are impaired in their ability to perform divided attention tasks when their blood/alcohol level reaches .08 and all people are impaired "at least [as to] mental capability by the time they reach a .10." Greenberg stated that an individual of Scott's weight who, at approximately

5

2:00 a.m., was piloting a boat at no less than twice the speed limit and crashed into a 43-foot white sailboat with its lights on and whose blood/alcohol level was between .15 and .23 approximately three hours later would have been "impaired by alcohol" at the time of the crash.

**B.     The Defense Case.**

**1.     Evidence that Vrooman was piloting the boat.**

Dr. Kenneth Solomon, an accident reconstruction expert, testified for the defense. Based on the nature and location of Vrooman's injuries and Marissa Brown's testimony that after the accident Vrooman came to rest on the right side of the boat Solomon concluded that Vrooman was standing and piloting the boat when the accident occurred. Solomon testified that Vrooman's chest injuries were consistent with his flipping over the console and striking the top of the steering wheel. His head injuries were consistent with his head hitting the hard top portion of the front seat. His body coming to rest on the right side pontoon, as testified to by Marissa Brown, was consistent with him standing behind the dinghy's steering wheel (which is on the right side of the dinghy) and "project[ing] forward." Solomon acknowledged that if Vrooman had come to rest on the dinghy's left pontoon with his head toward the front, as described by the sailboat's owner, David Brown, and the paramedic, Sturdivant, he might change his mind as to Vrooman's location at the time of the accident.

Scott attempted to support Solomon's testimony with the testimony of James Jones who accompanied Scott and Vrooman on trips around Avalon in the dinghy the day before the accident. Jones would have testified that Vrooman piloted the dinghy on some of these trips and that he stood while doing so especially when the dinghy approached a certain speed and its bow would rise. (Witnesses testified the dinghy was traveling between 10 and 20 knots at the time of the accident.) Vrooman's habit of standing to see over the rising bow would support Solomon's conclusion that at the time of the accident Vrooman was piloting the dinghy in a standing position. The court sustained the prosecution's objections to Jones's testimony as to the speed of the boat when the bow

6

would rise and his testimony that when the bow would rise it was Vrooman's habit to stand while piloting the boat.

At a sidebar conference the court also disallowed the testimony of Oliver Grani, a retired deputy sheriff, who would have told the jury that he advised Scott "to tell Mr. Vrooman's family, and Mr. Vrooman when he wakes up, if he does not know the answer to a question it is better for him simply to state I don't remember."

### 2. Exclusion of evidence regarding Scott's intoxication.

Scott sought to introduce the expert opinion of Dr. Arthur Kowell, a neurologist, who would have testified that the results of neurological tests performed on Scott at the hospital and the observational notes in his chart by hospital staff were inconsistent with Scott having a blood/alcohol level between .15 and .23 as reported in the hospital's records. In other words, based on the neurological examinations and observations, Kowell was of the opinion that Scott was not intoxicated at the time he was admitted to the hospital. Kowell conceded that he could not say whether or not Scott was intoxicated at the time of the accident nor could he say whether Scott's unconsciousness immediately following the accident was the result of alcohol intoxication or a concussion, although he believed the latter was more likely.

After a hearing under Evidence Code section 402, the court disallowed Kowell's testimony. The court ruled that Kowell's testimony was irrelevant because he admitted that he could not determine whether Scott was under the influence of alcohol at the time of the accident.

### C. The prosecution's rebuttal.

Dr. Firestone disputed Dr. Solomon's opinion that Vrooman was piloting the dinghy at the time of the accident. Firestone testified that neither Vrooman's injuries nor the position of his body on the boat's pontoon were consistent with Scott being the pilot.

### D. Conviction and sentencing.

A jury convicted Scott of felony boating under the influence in violation of Harbors and Navigation Code section 655, subdivision (f), and found true the

7

enhancement allegations of great bodily injury under Penal Code section 12022.7, subdivisions (a) and (b). The court sentenced Scott to the midterm of two years on the substantive offense plus five years under Penal Code section 12022.7, subdivision (b). The court stayed the punishment under subdivision (a) of the statute.

Scott filed a timely appeal.

## DISCUSSION

### I. ANY EVIDENTIARY ERRORS THE COURT COMMITTED WERE HARMLESS.

Scott contends that the court erred by excluding Dr. Kowell's testimony regarding Scott's intoxication, by refusing to allow him to show the jury a computer simulation of the accident prepared by his expert, Dr. Solomon, by allowing the prosecutor to make continuous groundless objections disrupting Solomon's testimony, by overruling his objection to a hypothetical question posed to a prosecution expert and by excluding the testimony of Jones, the friend of Scott and Vrooman, who rode in the dinghy with them the day prior to the accident. He also argues that the court erred in barring the testimony of retired deputy sheriff Grani who would have testified that he gave Scott certain advice to pass on to Vrooman regarding what Vrooman should say about the accident. (See pages 6-7, *ante*.)

With the exception of Grani's testimony, which bears on our harmless error analysis, we will proceed directly to the issue of prejudicial error without addressing the merits of the court's evidentiary rulings. As will be seen, any errors in those rulings, individually or collectively, were harmless because "it is not reasonably probable" that Scott would have obtained a more favorable result had they not occurred. (See *People v. Watson* (1956) 46 Cal.2d 818, 836; cf. *People v. Corona* (1989) 211 Cal.App.3d 529, 535 [the applicable harmless error standard "makes it entirely unnecessary" to decide the merits of the defendant's argument].)

8

### A.     Evidence As To Who Was Piloting The Dinghy When It Crashed.

A principal issue at trial was whether Scott or Vrooman was piloting the dinghy at the time of the accident.  The jury heard two conflicting expert opinions on that question.  The defense expert testified that Vrooman was standing at the wheel of the dinghy when it crashed.  (See page 6, *ante*.)

The defense theory that Vrooman was piloting the dinghy when it smashed into the sailboat hinged on Marissa Brown's uncertain recollection that Vrooman ended up on the dinghy's right pontoon after the crash.  Marissa conceded, however that "I may have my directions screwed up by now."  Solomon, the defense accident reconstruction expert, acknowledged that if Vrooman ended up on the dinghy's left pontoon (the side opposite the wheel) as testified by David Brown and Steve Sturdivant, the paramedic, it "might" change his opinion that Vrooman was piloting the boat.  Solomon also agreed that evidence Scott wound up on the right side of the boat would be consistent with Scott piloting the boat, not Vrooman.  Thus, the evidence supporting Solomon's opinion was weak.

The theory that Vrooman was piloting the boat was further weakened by Scott's admission to Vrooman's son Tyler that he was responsible for the accident.  Tyler testified that when he saw Scott at the hospital a few hours after the accident and asked him what happened, Scott replied:  "We were going too fast and I hit something."  Tyler then asked Scott:  "So you hit it, it did not hit you?" Scott replied:  "Yes."

Vrooman told his friend, Yvette Harbor that "he wasn't driving the boat."  At trial he acknowledged making that statement.

Furthermore, the jury could reasonably have found that Scott's attempts to avoid responsibility for the accident and to influence Vrooman's statements about what happened were the most telling evidence that Scott was the one piloting the boat.

Scott falsely told a deputy sheriff who came to the hospital to investigate the accident that two friends were in the boat with him and one of these unidentified friends was piloting.  Scott also told the deputy that the sailboat was anchored in the harbor with

9

its lights off and "they didn't see it before colliding with it." The undisputed evidence at trial contradicted both these statements.

Vrooman's son and daughter and his friend Yvette Harbor testified that they were told by Scott and his girlfriend that when Vrooman regained consciousness he should say that he doesn't remember who was piloting the boat.[3]

In an effort to counter the impression that Scott was attempting to tamper with or suppress the evidence as to who was piloting the boat, Scott offered the testimony of Oliver Grani, a retired deputy sheriff, who would testify that he advised Scott "to tell Mr. Vrooman's family, and Mr. Vrooman when he wakes up, if he does not know the answer to a question it is better for him simply to state I don't remember." The court correctly excluded Grani's testimony because it was irrelevant. In speaking to Vrooman's family and friend, Scott and his girlfriend did not repeat Grani's advice that *if* Vrooman does not know the answer to a question he should say he doesn't know or doesn't remember. Rather, Vrooman's son and daughter and friend testified that Scott and his girlfriend told them to tell Vrooman when he wakes up from his coma to say that he doesn't remember who was piloting the boat. The implication being that Vrooman should say he doesn't remember who was at the controls of the dinghy even if he does.

Given Scott's initial lies about how the accident occurred, his subsequent admission that he was piloting the boat when it crashed, his later attempts to influence Vrooman's testimony and the evidence undercutting his expert's opinion that Vrooman was responsible for the accident, "it is not reasonably probable" that the jury would have reached a more favorable verdict even if the excluded evidence had been admitted.

---

**3** The court instructed the jury that if it found Scott or his friend Jill made these statements, it may be considered as a circumstance tending to show consciousness of guilt.

### B. Evidence As To Whether Scott Was Under The Influence Of Alcohol At The Time Of The Accident.

Dr. Kowell, a neurologist, would have testified for the defense that the neurological tests and observations of Scott performed at the hospital approximately three hours after the accident were inconsistent with a person under the influence of alcohol. The court disallowed this testimony because Dr. Kowell admitted that he could not say Scott was not under the influence of alcohol at the time of the accident.

Even if the court's ruling was erroneous it was harmless because there was overwhelming evidence that Scott was under the influence of alcohol at the time of the accident.

The court instructed the jury that "[a] person is under the influence of any alcoholic beverage when as a result of drinking an alcoholic beverage his physical or mental abilities are impaired so that he no longer has the ability to drive a vessel with the caution characteristic of a sober person of ordinary prudence, under the same or similar circumstances." Dr. Greenberg testified that the mental impairments caused by alcohol include judgment, reasoning, depth perception, visual acuity and decision making. The evidence showed that Scott was traveling between two and four times the harbor speed limit and crashed into the side of a 43-foot white sailboat with its lights on. Scott's behavior fit Dr. Greenberg's examples of mental impairments caused by alcohol.

The court instructed the jury that it could infer from a level of .08 or more that Scott was under the influence of alcohol at the time of the offense. The evidence showed that even three hours after the accident Scott's blood/alcohol level was between .15 and .23.

Finally, although Dr. Kowell believed the assessments and observations of Scott at the hospital were inconsistent with a blood/alcohol level between .15 and .23, neither Dr. Kowell nor any other witness challenged the reliability of the hospital's blood tests.

11

**II.    THE COURT ERRED IN FAILING TO INSTRUCT THE JURY AS TO THE ACT FORBIDDEN BY LAW THAT SCOTT WAS ALLEGED TO HAVE COMMITTED BUT THE ERROR WAS HARMLESS.**

The court instructed the jury in relevant part that in order to prove a violation of Harbors and Navigation Code section 655, subdivision (f) "the following elements must be proved:  [¶] 1. A person drove a boat while under the influence of any alcoholic beverage. [¶] 2. That person concurrently did an act which violated the law or failed to perform a duty required by law . . . ."

The parties agree that by failing to instruct the jury on the particular "act which violated the law" that Scott allegedly committed the court failed to instruct on an essential element of the offense.  (Cf. *People v. Ellis* (1999) 69 Cal.App.4th 1334, 1339; *People v. Minor* (1994) 28 Cal.App.4th 431, 438-439.)

The error was harmless, however, because Sturdivant, the paramedic, and Marissa Brown, one of the sailboat's owners, testified without contradiction that the speed limit in the harbor where the accident occurred was 5 knots and it was undisputed that the boat was traveling at least twice that speed when it crashed.  Indeed, Scott's defense was built on the premise that the dinghy was traveling 10 knots or more which caused the bow to rise and Vrooman to stand up to drive.  "[I]nstructional error is harmless 'where a reviewing court concludes beyond a reasonable doubt that the omitted element was uncontested and supported by overwhelming evidence.'"  (*People v. Mil* (2012) 53 Cal.4th 400, 417.)  Thus, even under the strict standard of *Chapman v. California* (1967) 386 U.S. 18, 24m the court's instructional error was harmless because "it appears 'beyond a reasonable doubt that the error complained of did not contribute to the verdict obtained.'"  (*People v. Harris* (1994) 9 Cal.4th 407, 424.)

12

### III.  SUBSTANTIAL EVIDENCE SHOWED THAT VROOMAN WAS NOT AN ACCOMPLICE IN SCOTT'S DRIVING UNDER THE INFLUENCE.

The jury found true the enhancement allegations under Penal Code section 12022.7, subdivisions (a) and (b) that Scott personally inflicted "great bodily injury on [a] person other than an accomplice . . . ."  On appeal, Scott argues the prosecution failed to prove beyond a reasonable doubt that Vrooman was not an accomplice in Scott's piloting the dinghy under the influence of alcohol.  We disagree.

Initially we note that no California case has decided the issue whether the term person "other than an accomplice" is an element of the enhancement, an affirmative defense to the enhancement or whether the prosecution bears the burden of proving the person was not an accomplice only where the defense gives notice that accomplice status is an evidentiary issue.  (See *People v. Henley* (1999) 72 Cal.App.4th 555, 563-564 [discussing but not deciding the issue].)  In any case, there is circumstantial evidence sufficient to support the jury's finding that Vrooman was not an accomplice.

As one court has explained, "[o]rdinarily, accomplice liability under a coperpetrator theory or an aider and abettor theory is not associated with the crimes of gross vehicular manslaughter and felony drunk driving because of the individual nature of the act and mental state involved."  (*People v. Verlinde* (2002) 100 Cal.App.4th 1146, 1160.)  Thus, in the absence of evidence of "shared driving by two intoxicated individuals," the individual nature of the act of driving under the influence normally precludes a finding that a passenger was an accomplice to the crime.  (*Ibid.*)  As discussed above, there was substantial evidence to prove that Scott was piloting the dinghy when it crashed.  (See pages 3-5, *ante*.)  The photograph of the dinghy shows that it had only one set of controls, so unless Vrooman was sitting on Scott's lap or one was steering while the other one worked the throttle, Vrooman and Scott could not have been simultaneously sharing the piloting of the boat.

Scott maintains that the evidence does not rule out the possibility Vrooman aided and abetted Scott's drunk boating because he might have "egged him on to go faster."

13

The prosecution's failure to rule out every conceivable scenario involving Scott and Vrooman does not mean it failed to prove beyond a reasonable doubt that Vrooman was not an accomplice. As the court instructed the jury, reasonable doubt is not "a mere possible doubt; because everything relating to human affairs is open to some possible or imaginary doubt." There was no evidence of any other instance of Vrooman encouraging Scott to drink alcohol before or during his piloting the dinghy nor of Vrooman urging Scott to drive the dinghy at a high speed. Thus, there was no evidence from which the jury could infer that Vrooman aided and abetted Scott's drunk driving.

## IV. THE EVIDENCE DID NOT REQUIRE A REFERENCE TO AN ACCOMPLICE IN THE INSTRUCTIONS AND VERDICT FORMS.

Scott contends that the court erred in failing to instruct the jury that an enhancement under Penal Code section 12022.7, subdivision (a) required it to find that Vrooman was not an accomplice,[4] in failing to define the term "accomplice" in the instruction pertaining to subdivision (b) of the statute and in failing to include a finding in the verdict forms that Vrooman was not an accomplice.

We reject these contentions because they each depend on the existence of substantial evidence that Vrooman was an accomplice to Scott's boating under the influence. (*People v. Barton* (1995) 12 Cal.4th 186, 201 [an instruction is only required when there is "substantial evidence" to support it].) As discussed above, there was substantial evidence that Vrooman was *not* an accomplice and there was zero evidence that he was.

---

[4]    Scott concedes that the court included the not-an-accomplice element in its instruction on section 12022.7, subdivision (b). Therefore the error as to section 12022.7, subdivision (a) was harmless because the factual question posed by the omitted instruction was necessarily resolved adversely to the defendant under the properly given instruction as to subdivision (b). (*People v. Blakeley* (2000) 23 Cal.4th 82, 89.)

14

## V. THE SENTENCE MUST BE VACATED SO THAT THE TRIAL COURT CAN EXERCISE ITS DISCRETION WHETHER TO STRIKE THE ENHANCEMENTS OR THEIR PUNISHMENTS.

The parties agree that the court erred in believing that it had no discretion to strike the great bodily injury enhancements under Penal Code section 12022.7 or to strike punishments they carry and that the entire sentence must be vacated and the cause remanded for resentencing. (Pen. Code, § 1385, subds. (a) & (c)(1); and see *People v. Jones* (2007) 157 Cal.App.4th 1373, 1378-1379; 1384.) This disposition makes it unnecessary for us to address Scott's remaining contentions regarding sentencing errors. If it should become necessary, those issues may be raised at the new sentencing hearing.

### DISPOSITION

The sentence is vacated and the cause is remanded for resentencing to allow the court to consider whether the enhancements under Penal Code section 12022.7, subdivisions (a) and (b) or the punishments they carry should be stricken. If the court strikes the enhancements or their punishments, it shall forward an amended abstract of judgment to the California Department of Corrections and Rehabilitation. In all other respects the judgment is affirmed.

NOT TO BE PUBLISHED.



ROTHSCHILD, Acting P. J.

We concur:


CHANEY, J


JOHNSON, J.


15